Aleksandr PALATKEVICH and BPVN Technologies, Inc., Plaintiffs,

v.

Michael CHOUPAK, Anastasia Koroleva, Stanacard, LLC, Intermedia Net, Inc. Individually and as the Successor to Intermedia Net, LLC and Intermedia, Inc., Unison Technologies, Inc., Individually and as Successor to Unison Technologies, LLC, Victorian Management, LLC, Keku, Inc., Individually and as Successor to Keku, LLC, Stanacard, Ltd., and Eduard Romanov, Defendants.

Artur Natan Zaytsev and ANZFS, Inc., Plaintiffs,

v.

Michael Choupak, Anastasia Koroleva, Stanacard, LLC, Intermedia Net, Inc., Unison Technologies Inc., Victorian Management, LLC, Keku, LLC, Stanacard, Ltd. and Eduard Romanov, Defendants.

No. 12 Civ. 1681 (CM)
No. 12 Civ. 1682 (CM)

United States District Court, S.D. New York.

Signed January 21, 2016

Eileen Theresa Rohan, Law Offices of Eileen T. Rohan, Hudson, NY, for Plaintiffs.

Igor Krol, Krol & O'Connor, New York, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, UNITED STATES DISTRICT JUDGE.

At the time of the events in question, Defendants Stanacard, LLC, ("Stanacard") Stanacard Ltd., Intermedia.net, Inc. ("Intermedia"),[1] Unison Technologies, Inc.

---

1. The Court will refer to Intermedia.net, Inc. and its alleged predecessor companies—Intermedia Net, LLC, Intermedia DE, Inc., In-

("Unison"),[2] Victorian Management, LLC ("Victorian"), and Keku, Inc. ("Keku")[3] (collectively, "the Corporate Defendants") were related companies with common ownership and management.[4] The Corporate Defendants were in the business of selling "Voice Over Internet Protocol" ("VoIP") services to users, which enabled the users to place phone calls over the internet at rates that were lower than those charged by phone companies. See Amended Consolidated Complaint ("Compl.") at ¶¶ 40, 68, 71.

Defendant Michael Choupak was the founder, Chairman, Managing Member, and controlling shareholder of each of the six Corporate Defendants. See id. at ¶¶ 15–26, 77; Def. 56.1 ¶ 3; id. ¶ 10. Defendant Anastasia Koroleva—Choupak's wife—was the CEO and a shareholder of Stanacard; the "Vice President, Legal" of Intermedia (a position in which she allegedly performed no services); and a co-founder, Managing Member, and shareholder of Keku. See id. at ¶¶ 34–36; Palatkevich RICO Case Statement at 6; Def. 56.1 ¶ 18. Defendant Eduard Romanov was a minority shareholder of and, for a time, possibly, CEO of Stanacard, until he was replaced by Koroleva (this fact is contested). See Compl. at ¶¶ 38, 57; Def. 56.1 ¶¶ 10, 18; Pl. Counter 56.1, ¶ 18.

In 2006 and 2007, Choupak hired Plaintiffs to work for Stanacard.

The Amended Consolidated Complaint (hereinafter, the "Complaint") alleges that Defendants engaged in a "theft of services" scheme from about 1995 until 2010, pursuant to which Defendants would hire employees for start-up companies, induce them to provide services by providing or promising them equity interests in those companies, and then deprive the employees of their vested shares. See id. at ¶¶ 268–70; Palatkevich RICO Case Statement at 1–2, 5. Plaintiffs Palatkevich and Zaytsev were allegedly brought on board pursuant to this scheme. They were promised equity interests but, according to Plaintiffs, Defendants never intended to give them equity in the start-ups (or at least not the true value of that equity).[5]

### Palatkevich and BPVN's Employment at Stanacard, LLC

Plaintiffs Aleksandr Palatkevich and BPVN Technologies, Inc. ("BPVN"), an entity wholly owned by Palatkevich, initially provided consulting services to Intermedia for what was known as the "Stanaphone" project. Def. 56.1 ¶ 6. This project—a precursor telephony project — was ultimately abandoned, and in July of 2006 Palatkevich began work on another

---

termedia MN, Inc., and Intermedia, Inc.—collectively as "Intermedia." Plaintiffs have voluntarily dismissed the claims asserted against Intermedia. See Stipulation of Voluntary Dismissal, Docket No. 71.

2. The Court will refer to both Unison Technologies, Inc. and its alleged predecessor Company—Unison Technologies, LLC—as 'Unison.'

3. The Court will refer to both Keku, Inc. and its alleged predecessor company—Keku, LLC—as "Keku."

4. Intermedia was acquired by an unrelated entity named Oak Hill Capital Partners in 2011.

5. The Complaint also generally alleges that Defendants employed the same "theft of services" scheme to deprive 23 other employees of equity interests, including non-parties Igor Balk, Constantin Filin, Dan Jangigian, and Vladimir Rivkin, see Compl. at ¶¶ 269, 323, though—by Plaintiffs' own admission—the particular facts regarding the other employees have no bearing on Plaintiffs' claims for purposes of this motion. Plaintiffs make no arguments pertaining to these individuals other than to note that the context in which these individuals did or did not recover from Defendants "were fact-specific and bear no relation to the wire and mail fraud predicates that occurred during the plaintiffs' tenure at the defendant entities." Pl. Br. at 36.

project with Intermedia—the "Stanacard" project. Def. 56.1 ¶ 7; Rohan Decl. Ex. 30. In March 2007, Choupak formed Stanacard, and Palatkevich continued to provide software coding services to the new company. Palatkevich also allegedly served as Stanacard's Chief Technology Officer ("CTO"). *See* Compl. at ¶ 41. In return for his services, Palatkevich received a 10% share in Stanacard. Def. 56.1 ¶ 9. The agreement to provide Palatkevich equity in the project was originally oral, but was eventually memorialized in Stanacard's Limited Liability Company Agreement (the "Original LLC Agreement"). Rohan Decl. Ex. 3 at Schedule A.

The parties agree that Palatkevich's contributions to Stanacard were substantial. Def. 56.1 ¶ 7; Pl. Br. at 9; Palatkevich Aff. at ¶ 9. From July 2006 to July 2009, Palatkevich and a BPVN employee named Alexander Volkov developed software for Stanacard (and the precursor Stanacard Project) that implemented the company's VoIP technology. Def 56.1 ¶ 7, 26. The Complaint states that this software "transformed the company into a viable producer and merchant of internet-based telephony." Compl. at ¶ 102. Stanacard's VoIP system "went from being able to handle simultaneous transmission of 10 calls out of a customer base of 1,100 subscribers, to simultaneous transmission of approximately 2,000 calls, with a client database of approximately 220,000 subscribers." *Id.* at ¶ 120. Indeed, Stanacard's monthly revenues vastly increased following Palatkevich's implementation of the new software; in September 2006 monthly revenues were $4,760 and by late 2007 revenues were regularly at or near $1,000,000 per month. Rohan Decl. Ex. 2(a). Thus, Palatkevich and BPVN assert that they performed under their contract with Stanacard.

Stanacard paid BPVN, which in turn paid Palatkevich and Volkov, pursuant to a verbal agreement between Choupak and Palatkevich. Def. 56.1 ¶ 8; Compl. ¶¶ 98–100. Specifically, Stanacard paid $30,000 per month, which covered Palatkevich and Volkov's services as well as office space for BPVN. Rohan Decl. Ex. 7. On June 26, 2009, however, Choupak emailed Palatkevich that Stanacard was in dire financial condition and that the company would have to reduce his compensation considerably. Choupak wrote, "We're running a deficit—losing money on the monthly basis across all business [sic] to the tune of 200K per month. I have to take some drastic measures and let some people go and cut expenses here and there while trying to return to profitability that may take several months ... I propose bringing down your monthly fee to the level that we pay Edik Romanov—mainly [sic] 150K per year corp to corp starting July first." Rohan Decl. Ex. 7.

According to Plaintiffs, BPVN's operating costs made it impossible for Palatkevich to work for Stanacard for less money, so Palatkevich was "forced to resign" from Stanacard. *See* Compl. at ¶¶ 136–37; Pl. Counter 56.1 ¶ 26. He did so by email on July 6, 2009. Rohan Decl. Ex. 8b.

Despite his resignation, Palatkevich still owned a 10% interest in Stanacard. After a year had passed, Choupak moved to buy him out.

In May 2010, attorney David Feinberg commissioned—at Choupak and Koroleva's direction—a valuation of Stanacard from MFA Cornerstone Consulting ("MFA"), a business appraisal firm. Krol Aff. Ex. 12; *see* Compl. at ¶¶ 139–42. MFA valued a 10% share in Stanacard at just $32,000. Krol Aff. Ex. 13; Rohan Decl. Ex. 22. In its report, MFA states that it relied on "interviews with management of Stanacard, LLC" as well as "Analysis and review of financial and other information provided by Stanacard, LLC" and "information obtained from private and public

sources that [MFA] believe[s] to be reliable" to reach its conclusions. *Id.*

Plaintiffs contend that MFA provided a low-ball valuation, and that Choupak, Koroleva, and Romanov must have provided false or insufficient information to MFA in order to obtain such a below-market valuation. Compl. ¶ 142. Plaintiffs point to earlier valuations of Stanacard, which arrived at vastly different conclusions. For example, in November 2007 (two and one half years prior to the MFA evaluation), Choupak requested in-house company revenue projections from Oxana McLain, who was, according to Plaintiffs, an executive at Intermedia and Stanacard. Rohan Decl. Ex. 19a.; Pl. Br. at 11. In October 2008, McLain valued Stanacard at $100,000,000 and forecast that its value in 2012 value would be a whopping $450,000,000.[6] Rohan Decl. Ex. 20h. The projections on which these numbers were based assumed significant annual growth, *id* ; the evidence suggests that this assumption was not borne out in fact during the eighteen months after the valuation was completed. *Compare* Rohan Decl. Ex. 20h *with* Rohan Decl. Ex. 22 at 4.

In addition, Zaytsev obtained (allegedly at Koroleva's direction, *see* Zaytsev Aff. ¶ 15) a valuation for the company from a different appraisal firm, SVB Analytics, which valued a 10% interest in Stanacard at $175,500 [7] as of July 31, 2009, which was exactly the time at which Palatkevich severed his employment/consultancy relationship to the company and a year prior to

MFA's valuation. Rohan Decl. Ex. 21; Krol Aff. Ex. 82; Pl. Counter 56.1 ¶ 28.

In contrast with McLain's wildly optimistic assessment and SVB's more tempered analysis, MFA's 2010 report noted that, "The Company's financial projections (See page 5) indicate the Company will have no revenue growth over the next five years. According to management, this is considered an optimistic scenario." Rohan Decl. Ex. 22. Plaintiffs believe that management delivered overly pessimistic revenue projections and failed to provide MFA with the two earlier valuations, although they have no proof that this is so.

Having obtained a valuation for Paletkevich's shares, Choupak unilaterally amended the Original LLC Agreement—which had not contained any forced buy-back provision. The "First Amended and Restated LLC Agreement" for Stanacard (the "Amended LLC Agreement"), included a clause requiring former employees to sell their shares back to the company in the event of the termination of any Member's employment or working relationship with the company. *See* Rohan Decl. Ex. 12 § 10.3. This was done without Palatkevich's knowledge.

Choupak had the power to pass any amendment to the LLC Agreement he wished, because the Original LLC Agreement provides that "approval by or authorization of any action by or on behalf of the Company which requires a vote, consent, approval or action of or an election by the Members [8] shall require the consent of

6. Plaintiffs contend that McLain's valuation model predicted 2012 revenue of $450,000,000, Pl. Br. at 11, but the model, attached as Exhibit 20h to the Rohan Declaration, actually appears to forecast revenues of $74,600,559 and apply a revenue multiple of 6x to reach a "business valuation" of $450,000,000.

7. SVB Analytics' valuation ascribed a $27,000 fair market value to 1% of Stanacard LLC, but with a discount for non-marketability, the

final fair market value of 1% of the company's shares was calculated as $17,550. Rohan Decl. Ex. 21. From this calculation, the Court deduces that SVB analytics valued a 10% share at $175,500.

8. Members are defined as "each Person that (a) is an initial signatory to this Agreement, or has been admitted to the Company as a Member of the Company in accordance with the provisions of this Agreement, and (b) has not

Members holding aggregate Percentage Interests of greater than 60%." Rohan Decl. Ex. 3 at 6.4. One such type of action is specifically anticipated by Section 12.1 of the Original LLC Agreement, which states that: "This Agreement and any provision hereof may be amended or modified from time to time only by a written instrument signed by the Members holding not less than 60% of the Percentage Interest." *Id.* at 12.1. Choupak held more than 60% of the shares in Stanacard—he owned 70% of the corporation's shares—so he had the power to adopt any amendment to the agreement he wished.

The Original LLC Agreement also provides that, "Meetings of the Members may be called by any Manager or by Members holding Percentage Interests of at least 50%," *id.* at 6.5, and that *"written or telephonic notice stating the place, day and hour of the meeting and the purposes for which the meeting is called, shall be delivered not less than five (5) days before the date of the meeting,* either personally, by mail, or by electronic mail or facsimile transmission confirmed telephonically, by or at the direction of the Manager, *to each Member of record entitled to vote at such meeting." Id.* at 6.6 (emphasis added). But Choupak did not call a meeting of the Members in order to adopt this change to the LLC Agreement, and he did not send anyone (certainly not Palatkevich) any advance notice of what he intended to do. Instead, on August 12, 2010, Choupak, exercising the power of a controlling shareholder, executed the Amended LLC Agreement, which contained the aforementioned provision that allowed Stanacard to repurchase a Member's shares if his employment ended:

> In the event of the termination of any Member's employment or working rela-

tionship with the Company (including a relationship as a consultant to or manager of the Company) for any reason whatsoever, including death or physical or mental disability, then, from and after the date of such termination, the Company shall have the right to require such Member (the "Terminating Member") or the personal representative having charge of the estate of such Member or other successor to legal title to the Units of such Member (the "Terminating Member's Representative") to sell to the Company all or any portion of the Units owned by the Terminating Member as of the date of such event.

Rohan Decl. Ex. 12 at § 10.3(a).

The Amended LLC Agreement provides that, in the event of such a repurchase, "The purchase price for the Units to be purchased by the Company pursuant to Section 10.3(a) shall be determined by third party appraisal of the fair market value of the Units to be repurchased by an established business valuation firm chosen by the Company." *Id.* § 10.3(d).

It also provides that the Company may "offset[ ] the purchase price against the existing debt of the Member to the Company as evidenced by the Company's financial statements." *Id.* § 10.3(e).

The Original LLC Agreement did not have a provision requiring that amendments to the agreement be adopted at a meeting of the Members. Both the Original and Amended LLC Agreements are governed by Delaware law. Rohan Decl. Ex. 3 at 13.9; Rohan Decl. Ex. 12 at 13.9. Delaware law permits an LLC to take action without a meeting, prior notice, or a vote, as long as members with the sufficient number of votes to take that action

---

ceased to be a Member of the Company in accordance with the provisions of this Agreement or for any other reason." Rohan Decl.

Ex. 3 at 1.1. Choupak, Palatkevich, and Romanov were the Members under the Original LLC Agreement. Id. at 6.1, Schedule A.

consent by writing. *See* Del.Code Ann. tit. 6, § 18–302(d) (West). The Original LLC agreement explicitly adopts Delaware law in this regard, via a similarly worded provision, which states that "Any action requiring the vote, consent, approval or action of or an election by the Members . . . may be taken without a meeting if a consent in writing, setting forth the action so taken, will be signed by Members holding at least the percentage of the Percentage Interests required for such approval, consent or action." Rohan Decl. Ex. 3 at 6.10.

On August 13, immediately following the amendment of the Original LLC Agreement, counsel for Stanacard sent a letter to Alexander Berkovich, a lawyer for Palatkevich. The letter cites to the Amended LLC Agreement and informs Berkovich that "The Company has determined, by the consent of the sole Manager [Michael Choupak], to repurchase Mr. Palatkevich's Units for the full purchase price of $32,000, being the current fair market value of his units." Krol Aff. Ex. 13. The letter further states that "the Company sent Mr. Palatkevich a letter dated August 2, 2010 demanding repayment of $58,802.66 of debts owed by Mr. Palatkevich to the Company and my further understanding is that no such repayment has been made. Accordingly, payment of the $32,000 purchase price from Mr. Palatkevich's Units is being made by offsetting this amount against the $58,802.66 which Mr. Palatkevich owes the Company." *Id.*

The gravamen of Palatkevich's breach of contract claim against Choupak and Stanacard is that (1) he was not given the advance notice required by the Original LLC Agreement before the amendment enabling the repurchase of his shares was adopted; and (2) his shares were not repurchased at their fair market value, as required by the terms of the Amended LLC Agreement.

### Zaytsev and anzFS's Employment at Stanacard, LLC

From September 2007 to November 2009, Zaytsev provided financial and accounting services to Stanacard and its related entities. Initially, Zaytsev was employed on a temporary basis to separate Stanacard's financial affairs from those of Intermedia, following the incorporation of Stanacard. Def. 56.1 ¶ 12. Zaytsev was paid $3,000 per week for October, November, and December of 2007 through anzFS, Inc., a company wholly owned by Zaytsev. Def. 56.1 ¶ .

Following this initial period, Zaytsev continued to provide services to Stanacard. There is some dispute over whether Zaytsev was Stanacard's CFO, and even over whether he was actually employed by Unison or Stanacard—but the parties agree that Zaytsev continued to render services to Stanacard, specifically with respect to the company's financial operations, until November 2009. Def. 56.1 ¶¶ 14–15; Zaytsev Aff. ¶¶ 6–7. As payment, Zaytsev continued to receive $3,000 per week. Def. 56.1 ¶ 14.

Zaytsev also alleges that he was given a 10% stake in Stanacard as compensation for his work. In December 2007, at the end of Zaytsev's initial, temporary employment, Zaytsev and Choupak met at the Carnegie Club, where Choupak allegedly requested that Zaytsev continue his work for Stanacard and offered him a 2% ownership interest in the company as incentive. Zaytsev claims that he bargained for a 10% interest instead, to which Choupak agreed. Zaytsev Aff. ¶ 5; Krol Aff. Ex. 9. Defendants, on the other hand, contend that Choupak never offered Zaytsev a 10% equity interest in Stanacard, though Zaytsev instead "attempted to allocate [this ownership interest] to himself." Def. 56.1 ¶ 16; Pl. Br. at 18.

On March 17, 2008, Zaytsev emailed Choupak to confirm the revised distribution of equity for tax purposes. Zaytsev wrote, "We are in the process of preparing K–1's for StanaCard, LLC members. Please confirm ownership of equities in StanaCard, LLC[.] As of 12/31/2007: 1. David Michael Choupak 80% [,] 2. Aleksandr Palatkevich 10% [,] 3. Eduard Romanov 10% [.] As of 01/01/2008: 1. David Michael Choupak 70% [,] 2. Aleksandr Palatkevich 10% [,] 3. Eduard Romanov 10% [,] 4. Artur N. Zaytsev 10% [.] Thank you, Artur." Rohan Decl. Ex. 16.

Choupak replied, "2007 agree.2008 is more complex since we're issuing more shares that dilute everyone—not just me. For that we need to have some paperwork prepared." *Id.*; Def. 56.1 ¶ 16.

In September 2008, Choupak directed Daniel Ralls, counsel to Stanacard, to draft various agreements for Stanacard, including a revised LLC agreement and Non–Disclosure, Work-for–Hire and Non–Compete Agreements ("NDAs") for various Stanacard personnel, including Plaintiffs. Krol Aff. Ex. 27 ¶ 2. Choupak told Ralls to coordinate with Zaytsev regarding the preparation of these agreements. *Id.* ¶ 3. Zaytsev informed Ralls that he was a 10% owner of Stanacard, and Ralls drafted the revised LLC agreement accordingly. Def. 56.1 ¶ 19; Pl. Counter 56.1 ¶ 19; Rohan Decl. Ex. 23. Ralls completed the drafts— as well as a joinder to memorialize Zaytsev's equity in Stanacard—in December of 2009 and forwarded them to Koroleva for her review. Def. 56.1 20.

On January 9, 2009, Koroleva sent the drafts to Zaytsev and Palatkevich, writing, "Gentlemen, please sign the documents as instructed below." If you have any Qs please contact [Ralls].[9] Defendants claim that these original agreements were never signed; Plaintiffs deny that contention, citing to a deposition transcript that is not appended to the Rohan Declaration, but provide no further support for the premise that the original set of documents was executed at this time.

Sometime in January 2009 (presumably after January 9, when the original drafts were sent to Zaytsev), Choupak told Ralls that Zaytsev was not, in fact, entitled to equity in Stanacard. *Id.* ¶ 21. Following this conversation, neither Ralls nor Choupak reached out to Zaytsev to correct what was (from Defendants' perspective) Zaytsev's apparent misunderstanding. Pl. Counter 56.1 ¶ 21. Ralls subsequently revised the documents to eliminate any reference to Zaytsev's equity. Krol Aff. Ex. 27 ¶ 8.

On January 29, 2009, Choupak sent revised NDAs—without the revised LLC agreement and without the joinder—to Zaytsev and instructed him to sign them. Pl. Counter 56.1 ¶ 23; Krol Aff. Ex. 27 ¶ 9. Zaytsev signed the revised NDAs. He also signed the copy of the joinder and LLC agreement that had been sent to him earlier—the ones that afforded him equity in Stanacard. Def. 56.1 ¶ 24; Pl. Counter 56.1 ¶¶ 23–24. Again, Defendants did not challenge Zaytsev's understanding of his equity ownership.

The question of Zaytsev's equity interest (or lack thereof) came to a head in the fall of 2009. In the summer of 2009, Zaytsev told Daniel Ng, a CPA, to prepare Stanacard's tax return. As part of this endeavor, Ng prepared a K–1 statement reflecting Zaytsev's purported equity interest in Stanacard. Choupak never signed this return, and instead told a different firm to prepare a tax return that did not reflect any membership interest for Zaytsev.

9. Choupak and Koroleva also had Palatkevich and BPVN to sign Work-for–Hire Agreements around this time. *See* Compl. at ¶ 126.

Def. 56.1 ¶ 27, 29.[10] Exactly when Zaytsev learned that Choupak did not intend to give him equity in Stanacard is not clear,[11] but Plaintiffs contend that Choupak first told Zaytsev that he would not sign any document (including the tax return) that showed any equity interest for Zaytsev immediately prior to the latter's termination on November 29, 2009. Pl. Counter 56.1 ¶ 29. In any event, in April 2010 Choupak claimed in an email sent to Koroleva and Ralls, among others, that he "never intended to sign" a joinder agreement providing Zaystev equity. Rohan Decl. Ex. 40.

Plaintiffs allege that several individuals who learned of these events criticized Choupak and Koroleva for their treatment of Zaytsev, and that, in response, Choupak and Koroleva told those people that Zaytsev had been stealing from them. Compl. ¶¶ 345–350. For example, an individual named Alexander Gellerman stated at his deposition that, in late 2009 or early 2010, during a chance encounter at the Russian Vodka Room, Choupak told him that Zaytsev had stolen money from Stanacard. Rohan Decl. Ex. 55. Zaytsev claims that Choupak made the same statement to others—specifically, individuals named Vaho Khoutsishvili and Yan Yanovskiy—though he does not know precisely when or where these statements were made. Krol Aff. Exs. 70, 71. Those individuals were apparently never deposed. Similarly, he alleges that Koroleva made the same claims to an Anna Smorodskaya in London; Zayt-

sev stated at his deposition that these statements were made "next to her apartment, on the way to the park" (precisely whose apartment is unclear), at some unspecified time during 2010 or 2011. Krol Aff. Ex. 72.

### Procedural History

Plaintiffs initially brought separate lawsuits in New York state court. Zaytsev and anzFS filed suit on July 19, 2010, and Palatkevich and BPVN filed suit on May 19, 2011. See Compl. at ¶¶ 59, 258. The original complaints in the two federal actions were filed on March 7, 2012.

Two months later, on May 16, 2012, Plaintiffs' counsel asked the state court to dismiss the state actions so that Plaintiffs' various state law claims could be adjudicated along with their federal claims. On April 11, 2013, Plaintiffs' counsel advised this Court that the state court had granted her dismissal request, and that the Defendants' appeal from the order of dismissal had been decided in Plaintiffs' favor. See Docket Nos. 10, 14.

Plaintiffs then filed an amended complaint in this court, which Defendants promptly moved to dismiss. This Court granted Defendants' motion to dismiss Count 2 (breach of fiduciary duty), Count 3 (copyright and trademark infringement), Count 5 (minority shareholder oppression), Count 6 (fraudulent conveyance), Counts 10 and 11 (civil RICO, dismissed as unnecessary surplusage, explained below), and Count 12 (equitable accounting). See

10. Plaintiffs contend that Defendants were actually aware of the K–1 reflecting Zaytsev's interest as early as April 2009, but the cited exhibit—an email appended to the Plaintiffs' opposition brief—is not so clear cut. See Rohan Decl. Ex. 59

11. In the Complaint, Plaintiffs allege that beginning in August of 2009, Choupak and Koroleva also attempted to convince Zaytsev that he never obtained a valid equity interest in

Stanacard, either because Choupak was intoxicated when he made the initial promise in December 2007 or because Koroleva had no authority to approve the joinder in January 2009. See Compl. at ¶¶ 173–75. Plaintiffs do not identify any evidence in the record to support allegations regarding these conversations, which, if true, would undercut Plaintiffs' contention that Zaytsev continued to believe he owned 10% of Stanacard until shortly before his termination.

Memorandum Decision and Order Granting in Part and Denying in Party Defendants' Motion to Dismiss, Docket No. 46 (hereinafter, "Order").

In dismissing Counts 10 and 11, the Court did not dismiss Plaintiffs' civil RICO claim. However, to say that it was inartfully pleaded is an understatement. In the complaint as pleaded, Plaintiffs alleged four separate civil RICO counts: one count with predicate acts of copyright and trademark infringement (Count 8), one count with predicate acts of mail fraud (Count 9), one count with predicate acts of wire fraud (Count 10) and one count with predicate acts of money laundering (Count 11). Count 9 was alleged solely as a substantive violation under 18 U.S.C. § 1962(c), while the other three counts were alleged either as a substantive violation under § 1962(c) or as a conspiracy under § 1962(d). The complaint should have pleaded one count each of substantive RICO and RICO conspiracy, with all the predicate acts supporting the substantive count and all predicate acts other than mail fraud supporting the conspiracy count. The Court deemed the pleading to be so restructured; new Count 8 was deemed to allege substantive Civil RICO violations under § 1962(c), supported by all the alleged predicate acts, while new Count 9 was deemed to allege RICO conspiracy under § 1962(d). The Court dismissed Counts 10 and 11 as surplusage.

Turning to the predicate acts, the Court dismissed the allegations of predicate acts of copyright and trademark infringement and money laundering, leaving only alleged instances of mail and wire fraud as predicate acts under new Count 8.

After entry of the Order, the following claims remain:

*Federal Claims*

- Count 8: substantive civil RICO under 18 U.S.C. § 1964(c) with predicate acts of mail and wire fraud, as alleged by Palatkevich and Zaytsev against Choupak and Koroleva;

- Count 9: RICO conspiracy under 18 U.S.C. § 1962(d) with predicate acts of wire fraud only [12] as against all Defendants

*State Claims*

- Count 1: breach of the contract between Palatkevich/BPVN and Stanacard to provide software coding services for VoIP in exchange for monetary compensation and a 10% share in Stanacard (referred to in this opinion as Count 1(a)); breach of the contract between Zaytsev/anzFS and Choupak, acting in his official capacity as chairman of Stanacard, to provide financial and accounting services in exchange for monetary compensation and a 10% share in Stanacard (referred to as Count 1(b));

- Count 4: unjust enrichment as against all defendants (both plaintiffs);

- Count 7: fraud in the inducement against Choupak and Stanacard (both plaintiffs); and

- Count 13: slander (Zaytsev only against Choupak and Koroleva);

There is some confusion as to which counts, exactly, Defendants seek to dismiss. Defendants state in the parties' Joint Pre–Trial Order that they seek to dismiss only three out of the four remaining causes of action under New York law, "leaving for trial (i) Zaytsev's cause of action for a breach of an oral contract to

12. The mail fraud allegations in the complaint (prior to this court's restructuring) were pleaded only as substantive violations.

endow him with a ten percent (10%) membership interest in Stanacard (Count 1(b)) and (ii) Palatkevich's 'un-pleaded' cause of action for the determination of the fair market value of a ten percent (10%) membership interest." Joint Pretrial Order at 2. But in their memorandum in support of summary judgment, Defendants seek dismissal of the "remaining counts of the amended complaint" and, indeed, they brief each remaining claim. Def. Br. at 1. I thus assume that Defendants seek summary judgment dismissing all remaining counts.

For the reasons discussed below, the motion is granted in part and denied in part.

## DISCUSSION

### I. Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion" and the court must draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once this burden has been met, the nonmoving party may not merely rest upon the allegations in the pleadings, 'but must set forth specific facts showing that there is a genuine issue for trial.'" *Levitin v. Miller*, 92–CV–520 (KMW), 1994 WL 376078, at *2 (S.D.N.Y.

July 15, 1994) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the non-moving party fails to address an undisputed fact asserted by the moving party, "the court may ... consider the fact undisputed for purposes of the motion." Fed.R.Civ.P. 56(e). In demonstrating the existence of disputed issues of fact, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998), and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industries Co.*, 475 U.S. at 586, 106 S.Ct. 1348.

### II. Defendants' Motion for Summary Judgment Dismissing the Substantive Civil RICO Claim (Count 8) is Granted

▉ The elements of a § 1962(c) violation are "that a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir.2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.2001)). The enterprise here is an association-in-fact, consisting of the Corporate Defendants and controlled by Choupak, Koroleva, and Romanov, though only Choupak and Koroleva are both sufficiently distinct from the enterprise and sufficiently alleged to have conducted the enterprise to be sued for a substantive civil RICO violation. *See* Order at 20–29.

▉ Defendants argue that Plaintiffs have failed to establish the requisite "pattern of racketing activity." Def. Br. at 3. A "pattern of racketeering activity" requires the following proof: "(1) that each defendant committed at least two predicate acts of racketeering activity within a ten-year period, 18 U.S.C. § 1961(5); (2)

'that these racketeering predicates are interrelated; and (3) that they reveal continued, or the threat of continued, racketeering activity.'" *Casio Computer Co. v. Sayo*, 2000 WL 1877516, at *11 (S.D.N.Y. Oct. 13, 2000) (quoting *U.S. v. Diaz*, 176 F.3d 52, 93 (2d Cir.1999)). "To satisfy the relatedness requirement, the acts must 'have the same or similar purposes, results, participants, victims, methods of commission, or [be] otherwise ... interrelated by distinguishing characteristics and ... not isolated events.' " *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F.Supp.2d 345, 364 (E.D.N.Y.2000) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

Further, "a plaintiffs standing to sue under RICO requires" a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well.' " *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 234 (2d Cir. 1999).

Section 1961(1) of RICO sets out an exhaustive list of predicate acts, which include, *inter alia*, mail fraud and wire fraud. Plaintiffs argue that there are five predicate acts of mail or wire fraud (one of which is actually a set of multiple wire transfers). Pl. Br. at 30.

The first is "a series of wire transfers in 2008, directed by Michael Choupak that converted company funds for private purposes, without declaring it a dividend." Pl. Br. at 30. Unfortunately for Plaintiffs, allegations that Defendants used the wires to convert company funds for private purposes do not create a harm that is cognizable under RICO. Harms that are derivative—in that the injurious act merely causes a diminution in the value of a shareholders' stock—do not meet the proximate cause standard for standing required under RICO. *See Rand v. Anaconda-Erics-*

*son, Inc.*, 794 F.2d 843, 849 (2d Cir.1986); *At The Airport v. ISATA, LLC*, 438 F.Supp.2d 55, 63 (E.D.N.Y.2006); *Lakonia Mgmt. Ltd. v. Meriwether*, 106 F.Supp.2d 540, 551 (S.D.N.Y.2000). Assuming *arguendo* that Choupak converted company funds for private purposes, this injured Plaintiffs only insofar as Defendants' transfers diminished the value of whatever equity Plaintiffs allegedly owned; the wire transfers thus support a theory of harm that lacks the requisite proximate cause.

The second proposed predicate act is "the January 9, 2009 transmission by defendants Koroleva, Choupak and Stanacard, LLC of the original LLC Agreement, Joinder and four NDAs, designed to induce Palatkevich and Zaytsev to sign their NDAs, in the belief that they were obtaining 10% interests that would return distributions and other benefits." Pl. Br. at 30. This transmission went through the wires, as email. Plaintiffs argue that the contents of these documents, which indicated that Zaytsev held a 10% interest in Stanacard that Defendants had no intention of providing him, induced Zaytsev to continue working for Stanacard. Plaintiffs note that no one disabused Zaytsev of the notion that he was to be granted a 10% equity interest, despite their knowledge of his belief. *See* Pl. Counter 56.1 ¶ 21. Defendants have repeatedly asserted that they had no intention of giving Zaytsev an equity interest, and Choupak claimed to Koroleva and Ralls that he "never intended to sign" the joinder agreement. Rohan Decl. Ex. 40. This is a sufficient predicate act for purposes of a substantive Civil RICO violation predicated in wire fraud.

The third and fourth proposed predicate acts are "the 2010 act of willfully withholding an internal financial model that projected exponential future growth from MFA Cornerstone; [and] the August 2010 transmittal to Palatkevich, by both wire

and mail, of the fraudulent MFA report." Plaintiffs allege that Koroleva and Choupak "provided misleading, false and / or fraudulent statements and documents to MFA Cornerstone,"—presumably by email, though Plaintiffs do not specify—which that firm then used to determine the supposedly lowball valuation of Stanacard. Compl. ¶ 142.

But Plaintiffs point to absolutely no evidence indicating that misleading, false, or fraudulent information *was actually conveyed* to MFA. Plaintiffs state, in a conclusory fashion, that Oxana McLain's 2008 financial model *"appears* to have been withheld from MFA," Pl. Br. at 34 (emphasis added), but identify no evidence in the record to support what "appears" to them to be correct; for example, the record contains neither admissions from Defendants that they did not make the McLain model available to MFA nor testimony from representatives of MFA that they lacked access to the model.

Perhaps more importantly, Plaintiffs provide no support for the contention that withholding the McLain or SVB Analytics valuations from MFA is somehow fraudulent. To the contrary, it makes perfect sense that, when providing information to MFA, Defendants would omit outdated (and demonstrably erroneous) financial forecasts in lieu of actual financial data for the relevant time period. If the record established that Defendants had altered or otherwise failed to provide accurate financial data to MFA, the story would be different. But simply pointing to the discrepancy between old financial predictions and a more recently obtained one does not raise a genuine issue of material fact as to whether Defendants misled or deceived their chosen valuation firm.

 Palatkevich and Zaytsev both stated at their depositions that they did not actually know (1) who had provided information to MFA, (2) what information was provided, and (3) whether that information was false or misleading. *See* Krol Aff. Exs. 18–22. They testified only to their "belief" that whatever information MFA based its valuation on was "false" or "off." *See* Krol. Aff. Exs. 21–23. But a "thermonuclear" RICO claim [13] cannot be premised on mere belief. To withstand a motion for summary judgment, Plaintiffs must point to some evidence in the record supporting their claim that false information was sent to MFA. They do not.

It does not appear that any representative from MFA was deposed (or if one was, the court does not have the transcript); Plaintiffs do not otherwise make clear how MFA was misled. MFA's report includes the statement that it relied on "interviews with management" and an "analysis and review of financial and other information provided by Stanacard, LLC," and Plaintiffs do not identify how any of this information on which MFA relied was incorrect. It is Plaintiff s contention that the McLain valuation at least raises a genuine issue about the validity of the information that MFA received, but, as noted above, that valuation was stale and relied on what turned out to be overly optimistic revenue projections.

On a motion for summary judgment, a party may not rest on speculation or conclusory statement, and he must lay bare his proof, so that the court is apprised of

---

13. *See Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 655 (S.D.N.Y.1996) (designating civil RICO the litigation equivalent of a "thermonuclear device" for its "inevitable stigmatizing effect on those named as defendants" and asserting that courts should therefore "strive to flush out frivolous RICO allegations at an early stage of the litigation") (internal citation omitted) aff'd sub nom. *Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc.,* 113 F.3d 1229 (2d Cir.1997)

admissible evidence tending to support his position. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie,* 293 F.Supp.2d 397, 408 (S.D.N.Y.2003). In other words, having been served with a motion for summary judgment, Palatkevich had to provide the court with hard evidence that MFA was misled. Since he did not do so, he raises no genuine issue of fact that any misrepresentation or actionable omission was made. That means there is no proof of the fourth proposed predicate act, because there is no evidence that sending the valuation to Palatkevich in August 2010 constituted either mail or wire fraud.

Thus, neither the third nor fourth acts cited by Plaintiffs is a sufficient predicate acts for a substantive civil RICO violation.

The fifth proposed predicate act is "the unlawful transfer of computer software developed by plaintiff and licensed to Stanacard (non-exclusive) from Stanacard to Unison to Intermedia, for the exclusive benefit of Michael Choupak, Anastasia Koroleva, Eduard Romanov, Unison Technologies and its wholly owned subsidiary Unison Communications, Inc." Pl. Br. at 30. Only criminal copyright infringements qualify as predicate acts under RICO, *see* 18 U.S.C. § 1961(1) (including as a potential predicate offense the violation of 18 U.S.C. § 2319, "relating to criminal infringement of a copyright"), and when resolving Defendants' motion to dismiss, this court held that the Complaint did not adequately allege an act of criminal copyright infringement. Order at 31. Plaintiffs never repleaded, or even sought leave to replead, their copyright allegations; and they offer no evidence now that would support an inference of criminal copyright infringement, which requires that a defendant "willfully" infringe a copyright. *BWP Media USA Inc. v. Hollywood Fan Sites, LLC,* 69 F.Supp.3d 342, 361 (S.D.N.Y.2014).[14] Their argument in opposition to the pending motion is nothing more than an effort to obtain untimely reconsideration of the Order, which this court will not countenance.

Thus, Plaintiffs have succeeded in raising a genuine issue of fact about only one of the five purported predicate acts they pleaded in their complaint. As two predicate acts are required to undergird a viable claim for a substantive civil RICO violation, *Casio,* 2000 WL 1877516 at *11, Defendants' motion for summary judgment dismissing Count 8, the substantive civil RICO violation count, must be granted.

### III. Defendants' Motion for Summary Judgment Dismissing the RICO Conspiracy Claim (Count 9) is Granted

Because Plaintiffs' RICO conspiracy claim under § 1962(d) corresponds to the substantive RICO claims under § 1962(c) (except insofar as mail fraud is not alleged to be a predicate act for purposes of the RICO conspiracy claim), the Court must also grant summary judgment dismissing Count 9, the RICO conspiracy count.

Plaintiffs' allegations of mail and wire fraud as predicate acts for the substantive RICO count are also the basis for the RICO conspiracy count. *See* Compl. ¶¶ 323, 328. "Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996) vacated on other grounds, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510

14. Courts have held that "willfulness" requires "proof of the defendant's specific intent to violate someone's Copyright—that is to say, a voluntary, intentional violation of a known legal duty." *Id.*

(1998) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993)) (internal quotation marks omitted). *See also Knoll v. Schectman*, 275 Fed. Appx. 50, 51 (2d Cir.2008); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir.2004).

## IV. Defendants' Motion for Summary Judgment Dismissing the Breach of Contract Claims (Count 1) is Denied

In Count 1, each Plaintiff pleads breach of contract against Defendants, but as there were two separate alleged agreements—one with Palatkevich/BPVN and one with Zaytsev/anzFS—and the two breach claims raise vastly different issues, this court considers each Plaintiffs claim separately.

In what I am calling Count 1(a), the Complaint alleges that Palatkevich and BPVN entered into a contract with Stanacard in May 2006 to provide software coding services in exchange for monetary compensation and a 10% interest in the company. This contract was oral at first, but was eventually memorialized in the Original and later the Amended LLC Agreements, both of which indicate that Palatkevich had a 10% interest in Stanacard.

In what I am calling Count 1(b), the Complaint states that in December 2007 Zaytsev and anzFS entered into a contract with Choupak, who was acting in his capacity as Chairman of Stanacard, to provide financial and accounting services in exchange for monetary compensation and a 10% share. *See* Compl. at ¶¶ 154–58, 171, 177. All Plaintiffs assert that they performed under the contracts and that Choupak, Koroleva, and Stanacard[15] breached these contracts, either by illegally clawing back (in the case of Palatkevich) or not providing (in the case of Zaytsev)

the agreed-upon compensation: 10% equity interests.

■ As an initial matter, the record contains not one scintilla of evidence that Koroleva was a party to either Palatkevich's or Zaytsev's (alleged) contract. I thus grant summary judgment dismissing Counts 1(a) and (b) as against her. The discussion that follows evaluates the breach of contract claims asserted against Choupak and Stanacard.

■ To recover on a breach of contract claim under New York law, which applies to Zaytsev's alleged oral contract, a plaintiff must demonstrate: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

■ Under Delaware law, which governs the Original and Amended LLC Agreements, "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs." *Greenstar, LLC v. Heller*, 814 F.Supp.2d 444, 450 (D.Del.2011).

### A. Count 1(a)

Defendants argue that Palatkevich's breach of contract claim must be summarily dismissed because the evidence shows that Palatkevich was, in fact, given a 10% equity interest in Stanacard. Def. Br. at 26–27. Palatkevich does not dispute this. But he argues that Defendants are deliberately misconstruing his claim, which is twofold: he alleges (1) that the "clawback" of his interest violated the terms of the Original LLC Agreement, which was never legally amended; and in the alternative (2) that he was not adequately compensated for his clawed back interest, in violation of

---

15. The Court previously dismissed this Count as alleged against Romanov. *See* Order at 41.

the contract and "all equitable standards of fairness, good faith, and honest dealing." Pl. Br. at 39. The Complaint alleges that Defendants "unlawfully took steps to remove plaintiff Aleksandr Palatkevich as a Member of Stanacard, LLC, and reassign his shares to themselves." Compl. ¶ 147. It further alleges that "Plaintiff has never been compensated for the breach of contract, or the clawback of his ten percent equity share in Stanacard, LLC." *Id.* at ¶ 151. A generous reading of the Complaint—which, as this Court has previously noted, is a complete mess—supports Palatkevich's contention that he pleaded these particular breaches of contract. The question now is whether he has adduced any evidence to support either theory.

■ As for the first theory—that Defendants illegally clawed back his shares— Palatkevich has not raised a genuine issue of material fact concerning the legality of the buyback itself. The Original LLC Agreement did not give Stanacard the right to force a shareholder to sell his shares if he ceased affiliation with Stanacard, but it is undisputed that Choupak amended the LLC Agreement to provide for a buyback of the interests of LLC members who no longer worked for the company. It is also undisputed that Choupak had the right to unilaterally adopt such an amendment. The Original LLC, on whose text Palatkevich relies, provided that holders of at least 60% of the shares could amend the agreement. Choupak held more than 60% of the shares of the LLC. He therefore could not possibly have breached the contract by voting them as he wished. As a result, no one (certainly not Palatkevich) was in a position to stop him from altering the rights of other members by amending the LLC Agreement.

Palatkevich argues that Choupak's actions violated the Original LLC Agreement because he never received notice of the "meeting" at which the amendments were presented and adopted. But, Section 12.1 does not require a meeting to be held to amend the agreement. It simply requires Members holding at least a 60% interest to sign a written instrument memorializing any amendments that are adopted. Further, Delaware law, as incorporated into the Original LLC Agreement, permits members holding a sufficient number of shares to take action by written consent in lieu of a formal meeting of shareholders. Del.Code Ann. tit. 6, § 18–302(d); Rohan Decl. Ex. 3 at 6.10. Choupak held shares sufficient to amend the Original LLC Agreement, and the Amended LLC Agreement is Choupak's "written consent." So the fact that the action was not taken at a meeting, and that notice was not given, is simply not a breach.

Even if lack of notice *were* a breach, Palatkevich still has no actionable claim. Because Choupak held more than 60% of the corporation's shares, Palatkevich could not have stopped Choupak from amending the LLC Agreement to provide for a share buyback for departed Members, even if he received prior notice of Choupak's intention. Under Delaware law, a claim for breach of contract must result in some damage to the plaintiff; Palatkevich suffered no damage from the lack of notice. This is a simple case of no harm, no foul.

So we are left with Palatkevich's alternative claim that Choupak and the company breached the Amended LLC agreement by not paying fair value for his shares.

■ The Amended Agreement provides that the "purchase price for the [shares] to be purchased by the Company ... shall be determined by third party appraisal of the fair market value" of the shares. The valuation expert was to be of Stanacard's choosing. Palatkevich's shares were indeed valued by a valuation expert of Stanacard's choosing. The Agreement, however, requires that the valuation reflect the fair market value of the

shares. Palatkevich raises a genuine issue of fact on this question because he submits the Report of Anthony Fazzone, a managing director with Spectrum Consulting Partners, LLC, who valued a 10% stake in Stanacard as . of March 31, 2010 at $805,085. It is for a jury to decide whether MFA or Fazzone is correct. Should the trier of fact side with Fazzone, then a reasonable jury could conclude that Stanacard (but not Choupak) breached the LLC Agreement by repurchasing Palatkevich's stake at MFA's price estimate.[16]

Palatkevich also argues that Stanacard and Choupak breached "all equitable standards of fairness, good faith, and honest dealing" by repurchasing his shares for far less than they were worth. In Delaware, whose law governs the Original and Amended LLC Agreements, a covenant of good faith and fair dealing is implicit in every contract. *Gilman v. Marsh & McLennan Companies, Inc.*, 85 F.Supp.3d 757, 767 (S.D.N.Y.2015). The implied covenant of good faith and fair dealing "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch.1985)). "Thus, parties are liable for breaching the implied covenant of good faith when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id.*

However, this court has already concluded that there is no evidence in the record to support the bare allegation that Stanacard or Choupak gave MFA any false information. Thus, Palatkevich has not raised a genuine issue of material fact concerning any breach by Stanacard or Choupak of the implied covenant of good faith and fair dealing.

Defendant's motion for summary judgment dismissing Count 1(a) is, therefore, granted as against the individual defendants (Choupak and Koroleva) but denied as against Stanacard. We will hold a trial on the fair market value of Palatkevich's 10% stake.

### B. Count 1(b)

Zaytsev raises a genuine issue of material fact as to whether he had an oral contract with Choupak giving him a 10% equity interest in Stanacard.

Plaintiffs claim that Zaytsev was offered a 10% interest in Stanacard during a conversation with Choupak in December 2007, while Defendants contend that "Zaytsev attempted to allocate to himself" a 10% interest in the company. *See* Zaytsev Aff. ¶ 5; Def. 56.1 ¶ 16, Pl. Counter 56.1 ¶ 16.

As an initial matter, no one has asserted that any oral agreement that might have been made would have been unenforceable under the Statute of Frauds, so I will assume that any oral agreement that might have been made is enforceable.

There is a genuine issue of material fact as to whether the parties formed a contract that granted Zaytsev a 10% inter-

---

16. Plaintiffs argue that Delaware law imposes a Fair Value methodology on the buyout of minority interests, but the cited provision—Delaware Code § 15-701—is part of Delaware's Revised Uniform Partnership Act ("DRUPA"). *See* Del.Code Ann. tit. 6, § 15-701 (West). Plaintiffs do not provide any factual support or otherwise explain how this provision would apply here, to an LLC. DRUPA is, in any event, irrelevant, because the Amended LLC Agreement, not DRUPA, governs how an equity stake is to be valued for repurchase—*i.e.*, "third party appraisal of the fair market value." *See Anderson v. Snyder's Fishing Club*, No. CIV.A. 2137–MA, 2007 WL 1965533, at *2 (Del.Ch. June 21, 2007).

est in Stanacard. The evidence shows that, when Zaytsev emailed Choupak in March 2008, asking for confirmation that he owned 10% of the company as of January 1, 2008,[17] Choupak did not say, "You don't have any 10% interest in Stanacard as of January 1, 2008." What he said was "2008 is more complex since we're issuing more shares that dilute everyone—not just me. For that we need to have some paperwork prepared." Def. 56.1 ¶ 16. That could easily mean that Zaytsev was getting some of the "more shares" that "we're issuing" and that might "dilute everyone." Indeed, despite the fact that Zaytsev made no secret of his belief that he held a 10% interest in Stanacard—not only did he continue to work for the enterprise, he executed the agreements reflecting his equity ownership—no one thought to disabuse him of his belief for almost two years.

The lack of any denial in the face of Zaytsev's actions was reinforced in January 2009, when Koroleva emailed Zaytsev copies of a revised LLC Agreement and joinder that reflected Zaytsev's 10% ownership. This evidence more naturally suggests that Choupak had second thoughts after giving Zaytsev 10% of his company—not that he never gave the interest in the first place.

Whether Zaytsev has an equity interest (one that he would still own, for no one has tried to buy it back) will have to be decided by a jury. The motion for summary judgment dismissing Count 1(b) is denied.

## V. The Motion for Summary Judgment Dismissing the Unjust Enrichment Claim (Count 4) Is Granted as Asserted by Palatkevich and Denied as Asserted by Zaytsev

Defendants argue that Plaintiffs' unjust enrichment claim must be dismissed be-

cause it is ostensibly predicated on Defendants' unauthorized transfer of certain computer software and programs, in which this Court has already determined Plaintiffs did not own copyright. Defendants further argue that an unjust enrichment claim based on the transfer of copyrighted material is preempted by the Copyright Act. *See* Pl. Br. at 28–33.

Defendants are correct on both counts. In the Order, this court dismissed Count 3 of the Complaint—Plaintiffs' copyright infringement claims—because (1) Plaintiffs failed to allege that they registered copyrights in computer programs Defendants allegedly transferred/used (registration generally being a predicate to bringing suit on a copyright infringement claim, *see Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010)) and (2) Plaintiffs, via the NDAs, assigned any rights they had in software programs they designed to Stanacard. Order at 11–17.

Furthermore, even if Plaintiffs did own copyrights in the relevant programs and had registered them, "the Copyright Act preempts state law actions that seek to vindicate rights equivalent to those protected under the Copyright Act." *Transcience Corp. v. Big Time Toys, LLC*, 50 F.Supp.3d 441, 453 (S.D.N.Y.2014); *Einiger v. Citigroup, Inc.*, 2014 WL 4494139, at *7 (S.D.N.Y. Sept. 12, 2014).

But once again, Defendants misunderstand the reason why the unjust enrichment claim survived the motion to dismiss and—at least in Zaytsev's case—now survives the motion for summary judgment.

The unjust enrichment claim withstood Defendants' motion to dismiss because

---

17. Rohan Decl. Ex. 16 contains Zaytsev's admission that he did not own any shares of

Stanacard during the calendar years 2007.

Plaintiffs alleged that Defendants benefited from Plaintiffs' services, in exchange for which Plaintiffs were each supposed to receive 10% interests in Stanacard. *See* Order at 41–42. In other words, Plaintiffs' allegations state a claim for unjust enrichment, not because such software/code/programs were Plaintiffs' copyright—they were not—but because Plaintiffs alleged that Defendants were "enriched" by the work each of them did for Stanacard, at Plaintiffs' "expense" (because they did not get compensated for their work via receipt of 10% of the company)—and that "it is against equity and good conscience to permit [Defendants] to retain" the fruits of Plaintiff s work while Plaintiffs are deprived of their benefit of the bargain. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (2011).

On the record before the Court, however, only Zaytsev's claim withstands the motion for summary judgment.

 As acknowledged in the Order, the claim for unjust enrichment is duplicative of the claim for breach of contract; a plaintiff may not recover under both theories. Order at 43. A plaintiff "cannot ultimately recover on both his quasi-contract claim and his breach of contract claim." *Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*, No. 12–CV–6075 TPG, 2013 WL 1209799, at *12 (S.D.N.Y. Mar. 22, 2013). However, "when 'there is a bona fide dispute as to the existence of a contract ...' a plaintiff may proceed upon a theory of quasi-contract and need not elect his or her remedies." *Id.* (quoting *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 187 A.D.2d 225, 594 N.Y.S.2d 144, 146 (1st Dep't 1993)).

 For this reason, Palatkevich's claim for unjust enrichment must be dismissed. The parties agree, and the record establishes, that there is a valid contract governing Palatkevich's entitlement to a 10% equity interest in Stanacard—namely, the LLC Agreements, Original and Amended, both of which explicitly recognize his interest in that amount. *See* Rohan Decl. Exs. 3, 12. Because the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter," *Clark–Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987), the unjust enrichment claim asserted by Palatkevich is dismissed.

 Zaytsev's unjust enrichment claim survives, however, precisely because there is a genuine issue of material fact as to whether Zaytsev had an enforceable contract with Choupak that gave him a 10% equity interest in Stanacard. If Zaytsev loses on his breach of contract theory, he can proceed with a claim for unjust enrichment as an alternative to his breach of contract claim, as Judge Stanton held in *Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, 2015 WL 4092392 at *6 (S.D.N.Y. July 6, 2015). In that case, the court denied the motion to dismiss an unjust enrichment claim that was "made in the alternative to the claim for breach of contract, to the extent that the Court might find that [defendant] did not have contracts with [plaintiff]." Here, of course, we are at a later stage of the litigation, but since there is still a question as to whether Zaytsev had a contract with Stanacard, the same principle applies.

## VI. Summary Judgment Dismissing the Claim for Fraud in the Inducement (Count 7) is Granted as to Palatkevich's Claim and Denied as to Zaytsev's

 Under New York law, a claim for fraud in the inducement requires: "(1) a misrepresentation or omission of material

fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Podlin v. Ghermezian*, 2014 WL 2601416, at *7 (S.D.N.Y. May 28, 2014).

However, "a cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing." *Grappo v. Alitalia Linee Aeree Italiane S.p.A.*, 56 F.3d 427, 434 (2d Cir.1995). "Where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir.2001) (internal quotation marks and citation omitted).

Thus, for a plaintiff to state a claim for both fraud in the inducement and breach of contract, he must "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Podlin*, 2014 WL 2601416, at *7.

With respect to Palatkevich, the record provides no evidence of any duty on the part of Defendants separate from their duties as set out in the Original and Amended LLC Agreements. Further, Palatkevich points to no "misrepresentation collateral or extraneous to the contract" and no special damages not compensable as contract damages. Palatkevich had a 10% interest in the LLC, for which he may not have received fair value when he was bought out. But the promise to provide

fair market value for any clawback is not collateral to the contract; it is *integral* to it.

Zaytsev, too, offers no evidence of any duty separate from the alleged contract, any misrepresentation collateral to it, or any special damages. Under Zaytsev's own theory, Defendants' March 2008 (Choupak) and January 2009 (Koroleva) emails indicating that he had a 10% interest (or at least failing to state that he did not, in the case of the former) do not contain fraudulent misrepresentations. On the contrary, they constitute evidence of the claimed oral contract that was allegedly breached—an agreement to give him a 10% interest, in consideration of which he would continue working at Stanacard. Only if there were no contract to give him that interest would these statements be fraudulent. Zaytsev has not identified any other "misrepresentation" by any of the Defendants. Thus, to the extent that a valid contract between Zaytsev and Defendants exists, Defendants are entitled to summary judgment, dismissing the fraudulent inducement claim, because Zaytsev raises no genuine issue of fact that the contract was "induced" by any "fraud."

But if there was no contract, Zaytsev's evidence might support a claim for simple, straightforward fraud—to wit, that he reasonably relied on misrepresentations and omissions about his ownership stake and was thereby induced to continue work at Stanacard, to his detriment. There is nothing wrong with his assertion of such a claim, even though he has also asserted claims for breach of contract and for unjust enrichment: "Where, as here, there are allegations of fraud in the inducement and a dispute as to whether a valid contract exists, parties can and routinely do plead in the alternative fraud, unjust enrichment, and breach of contract." *Burton v. Iyogi, Inc.*, 2015 WL 4385665, at *11 (S.D.N.Y. Mar. 16, 2015). And Zaytsev

easily raises a genuine issue of material fact on a fraud claim. Therefore, Defendants are not entitled to summary judgment dismissing Count 7 insofar as it relates to Zaytsev's claim of fraud in the inducement. To the extent that this claim is co-extensive with Zaytsev's claim for unjust enrichment, the jury will be instructed that Zaytsev is not entitled to double recovery.

## VII. Summary Judgment Dismissing the Slander Claim (Count 13) is Granted

██ "The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir.2001).

Defendants argue that (1) the statute of limitations on slander claims had run before Plaintiffs filed their complaint in federal court, (2) the amended complaint set forth neither the particular words complained of nor the time, place, and manner of the false statement, and (3) the Complaint failed to allege how or whether Zaytsev was injured by virtue of the alleged slander. Def. Br. at 36–39. Plaintiffs' manifestly deficient response is that non-party witness Gellerman's testimony "creates a triable issue of fact." Plaintiffs do not even acknowledge Defendants' arguments, let alone respond to them. That is unfortunate, because the statute of limitations is dispositive.

██ Only one of the four alleged incidents of slander is adequately supported by admissible evidence in the record. With respect to two of the alleged recipients—Vaho Khoutsishvili and Yan Yanovskiy—Plaintiffs have failed even to offer any evidence of when the slanderous statements were allegedly made. As for Koroleva's allegedly slanderous statements to Anna Smorodskaya, Zaytsev was not present when the statement was made; he knew of it only because Smorodskaya told him. Krol Aff. Ex. 72. Smorodskaya herself was not deposed, and Zaytsev's hearsay testimony is not admissible to prove the truth of the matter asserted (which, in the case of a slander, is that the statement was made). Fed. R. Ev. 801(c). Additionally, Zaytsev cannot place the statement in time; he testified only that the conversation happened "around" 2010 or 2011. *See* Krol Aff. Ex. 72. This is insufficient even for pleading purposes, and discovery has yielded no more specificity regarding the time of the alleged conversation. *See Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1, 5 (1999) (plaintiff must allege the "time, place and manner" of the slanderous statement). Approximations—especially running over two years—are not sufficient for this purpose. This may be why Plaintiffs did not mention the alleged statements made to Khoutsishvili, Yanovskiy, or Smorodskaya when briefing this motion; the claims can, therefore, be deemed abandoned.

Gellerman, however, was at least deposed, and he provided information about Choupak's allegedly slanderous statements to him—including that they were made at some unspecified date in late 2009 or early 2010.

Any slander claim predicated on a statement made during that period is untimely.

██ The statute of limitations for slander in New York is one year, and it begins to run from the date of publication (which, for a claim of slander, is the date the statement was made). *Casa de Meadows Inc. (Cayman Islands) v. Zaman*, 76 A.D.3d 917, 920, 908 N.Y.S.2d 628 (2010). This case was filed in federal court in March 2012, more than two years after the

alleged conversation between Choupak and Gellerman took place. Thus, the federal claim is untimely on its face.

However, Zaytsev's slander claim was originally brought in New York State Supreme Court on July 19, 2010, less than a year after Choupak's alleged conversation with Gellerman. The question is, does the federal claim somehow relate back to the timely state claim?

When state claims are removed to federal court pursuant to 28 U.S.C. § 1441, the relevant date for tolling purposes is the filing of the claim in state court. *See Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F.Supp.2d 439, 448 (S.D.N.Y.1998). But Zaytsev's state court case *was not removed to this Court*; nor could it have been, since his state court lawsuit asserted only common law claims and complete diversity of citizenship is lacking. Rather, Zaytsev commenced a brand new lawsuit in this court, in March 2012, in which he re-asserted some of the claims that he had previously pled in the New York State Supreme Court. He then voluntarily discontinued his state court action. So the removal statute's "relation back" rule does not apply to Zaytsev's pleading.

New York's tolling statute, New York's Civil Practice Law and Rules § 205, is of no help to Zaytsev either. That statute, which was passed to deal with successive suits on the same claim, provides:

> If an action is timely commenced and is terminated *in any other manner than by a voluntary discontinuance*, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or, if the plaintiff dies, and the cause of action survives, his or her executor or administrator, may commence a

new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

N.Y. C.P.L.R. 205 (McKinney). Thus, if an action is timely commenced and terminated for a reason other than one prohibited by statute, the plaintiff may generally commence a new action on the same claim "within six months *after* the termination."

There are two reasons why CPLR § 205 does not help Zaytsev. First, the slander claim was asserted in this court two months *before* Zaytsev discontinued his action on the same claim in the New York State Supreme Court; the special tolling provision of CPLR § 205 applies only to lawsuits brought "within six months *after* the termination" of the former lawsuit. Second, by its terms, CPLR § 205 does not apply to claims that were voluntarily discontinued. Here—in order to pursue frivolous federal claims, including a RICO claim—Zaytsev voluntarily discontinued his timely defamation action in the New York State Supreme Court.

So CPLR 205 does not render Zaytsev's defamation pleading timely in this court, either.

This court can find no other basis on which the untimely slander claim could "relate back" to the 2010 state court action, and Zaytsev certainly does not suggest one. The concept of relation back "enables a plaintiff to correct a pleading error—by adding either a new claim or a new party—after the statutory limitations period has expired," *Buran v. Coupal*, 87 N.Y.2d 173, 177, 661 N.E.2d 978, 981, 638 N.Y.S.2d 405 (1995). *See also* F.R.C.P. 15(c).[18] It does not permit a party to

---

18. Where a state claim is at issue for pur-

poses of relation back, FRCP 15(c)(1) requires

voluntarily withdraw one lawsuit and file another against the same parties in a different venue while tolling the statute of limitations.

 Further, the concept of relation back permits parties to modify claims already filed, not to file entirely new lawsuits. In *Rayo v. State of New York,* 882 F.Supp. 37, 40 (N.D.N.Y.1995) the plaintiff filed a claim in state court, which was dismissed. He then filed an untimely complaint in federal court, and sought to "relate back" his claims to the filing of the original and timely state court complaint. The District Court held that the plaintiff's claims were time barred, because, "The relation back doctrine has application only in instances where an original pleading is amended. Fed.R.Civ.P. 15. If such an amendment satisfies the requirements of Rule 15(c), the amended pleading "relates back" to the original pleading for statute of limitations purposes. The amendment does not, however, relate back to any prior proceedings which are not part of the action in question."

So too, here. Zaytsev cannot, by filing a brand new lawsuit, "relate back" his slander claim to the earlier, timely filed claims in a wholly separate lawsuit in a different court.

In short, as a result of his misguided effort to turn his state court case into a federal action, Zaytsev has outsmarted himself. The defamation claim based on the allegedly slanderous statement made to Gellerman is dismissed as barred by the statute of limitations.

Because I am granting summary judgment on Defendants' first argument, I

need not reach their second and third arguments.

## VIII. Supplemental Jurisdiction

Defendants ask that the Court "decline to exercise its supplemental jurisdiction under 28 U.S.C. §§ 1367(c)(2–3) and ... relegate plaintiffs to the Supreme Court, New York County." Def. Br. at 40. As I have dismissed all remaining claims over which there was original jurisdiction, I must decide whether to exercise supplemental jurisdiction over the remaining state law claims.

 Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims where "the district court has dismissed all claims over which it has original jurisdiction." The Supreme Court has advised that:

> [A] district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate. The discretion to remand enables district courts to deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine.

*Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). "In weighing these factors, the district court' is aided by the Supreme Court's additional guidance in *Cohill* that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the

that a Court apply the more permissive standard as between state and federal law. *Wilson v. City of New York,* 2006 WL 2528468, at *2 (S.D.N.Y. Aug. 31, 2006). Here, neither the state nor federal doctrine deems Zaytsev's

slander claim to "relate back" to his original state court pleading, so there is no need to determine which law, state or federal is more "favorable" to Zaytsev.

remaining statelaw claims." *Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.2006) (internal quotation marks and citation omitted).

■ Though I am loathe to reward Plaintiffs' tactics in this matter—in particular the filing of an utterly insufficient civil RICO claim to get their foot in the door of federal court—this case has come too far here to send it back to New York State Supreme Court. I have, by this point, delved deeply into both the issues presented by the parties and the record, and principles of judicial economy weigh heavily in favor of trying those issues in front of a judge who is now intimately familiar with them.

This case will be tried on Monday April 25. The Final Pre–Trial Conference will be held on Friday April 15 at 11:00 AM. Counsel should read my rules and be prepared to obtain rulings on all objections to exhibits that are proposed (in the Pre–Trial Order) to be entered into evidence at trial. Make sure to bring the exhibits (including copies for the court) and arguments, because all objections will be ruled on at the conference.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. The Clerk of the Court is directed to remove Docket No. 130 from the Court's list of pending motions.