GEORGE B. DANIELS, United States District Judge
This civil RICO action, brought by Plaintiff Equinox Gallery Limited ("Equinox Gallery") against Defendant Fred Dorfman and two business entities he exclusively owns and controls, Dorfman Projects LLC and Fred Dorfman, Inc. (collectively, "Defendants"), arises out of an alleged scheme to sell stolen Jasper Johns artwork to unsuspecting buyers. (Compl., ECF No. 1, at 1, 6.) Plaintiff asserts federal claims against all Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., as well as claims for fraud, breach of warranty, and unilateral mistake, for allegedly selling to Plaintiff one such painting stolen from Johns' art studio by his longtime studio assistant, James Meyer. (Compl. ¶ 1, 103-265.) Defendants move to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and to strike Plaintiff's request for punitive damages. (Mot. to Dismiss, ECF No. 21; Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem."), ECF No. 23, at 1-2.)
Defendants' motion to dismiss is GRANTED as to Plaintiff's claim for breach of warranty and DENIED in all other respects.
I. BACKGROUND
Since its incorporation in 1976, Defendant Fred Dorfman, Inc., which is solely owned and operated by Defendant Fred Dorfman, has been recognized in the fine-art community for its expertise in presenting contemporary artists to a wide audience of collectors, galleries, and dealers.[1] (Compl. ¶¶ 21-22.) According to Plaintiff, however, more recently it has been involved in a criminal racketeering scheme *566 to sell nearly forty pieces of art stolen from renowned contemporary artist Jasper Johns' studio by one of Johns' longtime and trusted studio assistants, James Meyer. (Id. ¶ 1.)
For many years, Jasper Johns has maintained an art studio in Sharon, Connecticut. (Id. ¶ 35.) In 1985, James Meyer became one of Johns' studio assistants. In that position, he helped Johns create artworks and assisted with various administrative and record-keeping tasks. By virtue of his role as studio assistant, Meyer had unfettered access to the studio and its books and records, including a ledger that contained a description and inventory number for each of Johns' completed artworks. (Id. ¶¶ 37-38.) He also had access to Johns' unfinished works and was responsible for maintaining a file drawer holding such works and others that Johns' had not yet authorized to be placed into the art market. In addition, Meyer was responsible for destroying pieces that Johns was not satisfied with or otherwise did not want included among his body of finished works. (Id. ¶ 39.) In the 1990s, however, Meyer began stealing artwork from the studio, taking drawings that Johns had wanted discarded-sometimes straight from the trash-as well as some of Johns' unfinished works. (Id. ¶¶ 40-41.)
Sometime in 2003, Meyer and Fred Dorfman were introduced.[2] For the next three years, Dorfman embarked on a campaign to convince Meyer to allow him to represent the latter as an independent artist. What Meyer did not know, however, was that Dorfman never intended to represent him or his interests, but rather sought only to use him to gain access to Jasper Johns' artwork. (Id. ¶¶ 43-44.) Indeed, from 2003 through 2006, other than two pieces that he bought for himself, Dorfman never sold any of Meyer's art to any other galleries or collectors. Instead, Dorfman repeatedly asked Meyer if he had access to Johns' discarded and/or unfinished works and pressured him to obtain as many of them as he could so that the pair could sell them for profit. (Id. ¶ 44.) In or about the fall of 2006, Meyer finally acquiesced and began delivering discarded and unfinished artwork from Johns' studio-some of which he had already previously stolen-to Dorfman to sell to his contacts in the art world. (Id. ¶¶ 45-46.)
The alleged scheme was well planned and carefully executed to ensure its longevity. For instance, to convince prospective buyers that the stolen works were authentic, that Meyer had good title, and that Johns had authorized their sale, Dorfman had affidavits prepared for Meyer's signature attesting that Johns had given him the various works as gifts.[3] (Id. ¶ 47.) Dorfman also provided counterfeit labels that were sometimes affixed to the back of stolen artwork to create the impression that their sale had been authorized by Johns. (Id. ¶¶ 159, 224-25.) Through his business entities, Dorfman also provided written assurances to prospective buyers certifying, falsely, that the purchased artworks would be included in the Jasper Johns catalogue raisonne and recorded in his studio archives when they were prepared.[4] (Id. ¶ 48.) In some instances, *567 Dorfman even provided buyers with false records, including fictitiously-assigned inventory numbers so as to give the appearance that the artworks were finished and authorized for sale. (Id. )
In addition, Meyer sometimes fabricated other documents purportedly taken from the studio's ledger of registered artworks, describing the artwork, listing its fictitious inventory number, and stating falsely that the work had been gifted to Meyer. On occasion, Meyer even placed these fake pages into the ledger, photographed them in that setting, and then provided them to Dorfman so that they could be transmitted to prospective buyers. (Id. ¶ 56.) Further, and to ensure that Johns never learned of the scheme, Dorfman imposed confidentiality and re-sale restrictions prohibiting buyers from disclosing the sale, including by reselling, exhibiting, or loaning the works to others for at least eight years following the sale. (Id. ¶ 49.)
In mid-December 2007, Dorfman, by and through his business entities, contacted an art adviser seeking prospective buyers for a particular piece of stolen Jasper Johns artwork.[5] As with all the other stolen Johns artwork that Dorfman sold, he represented to the art adviser that Johns had gifted the piece to Meyer. According to the complaint, even though he was speaking with the art advisor, Dorfman knew that the art advisor was working on behalf of Plaintiff, a prospective buyer. Plaintiff is an art gallery located in Vancouver, British Columbia. (Id. ¶¶ 18, 59-60.) Dorfman provided the art advisor with images and additional details about the work, who in turn shared them with Plaintiff. The art adviser also helped Plaintiff negotiate and consummate the sale. (Id. ¶ 61.) Despite it being an authentic Jasper Johns painting, even containing his signature, Plaintiff asserts that it would have never bought the painting had it known the truth of its provenance. (Id. ¶¶ 62-63.)
As with all the other stolen Johns paintings he sold, Dorfman had an affidavit prepared attesting to Meyer's ownership of the artwork and its authenticity. (Id. ¶ 64.) Meyer executed the affidavit on January 11, 2008, and had it notarized by Dorfman's wife. (Id. ¶¶ 64-65.) On or about the same date, a separate confidentiality agreement was drafted for Plaintiff's signature, requiring Plaintiff to "keep the Artwork private and ... not sell or loan the Drawings to anyone or any institution within the first ten (10) years of his ownership." (Id. ¶ 66.) Plaintiff accepted the terms of the sale and on January 15, 2008, was invoiced a bill for $800,000 to purchase the Johns artwork.[6] (Id. ¶¶ 67, 69, 72.)
Following the sale to Plaintiff, Dorfman and his business entities sold at least another fourteen stolen Johns artworks to unsuspecting purchasers. In doing so, Dorfman continued assuring prospective buyers that the artworks were given to Meyer as gifts. (Id. ¶¶ 79-80.) For instance, on January 20, 2010, Dorfman forwarded an email (the "January 20, 2010 email") from Meyer to the same art adviser who connected Dorfman with Plaintiff, indicating the stolen works "were given" to *568 Meyer. On February 2, 2010, Dorfman forwarded another email to the art advisor from Dorfman's wife (the "February 2, 2010 email") providing additional information about the Johns artworks, and indicating that the art advisor has "no reason to believe that the work is anything but in [Meyer's] rightful possession." (Id. ¶¶ 81-82.) The February 2, 2010 email went on to confirm that the stolen artwork "was a gift from Jasper" and that the art adviser can "justifiably rely on [Meyer's] sworn statement." (Id. ¶ 82.) Later, in September 2011, Dorfman drafted a false certification "to be shared with Plaintiff," which indicated that the artwork it purchased would be included in Johns' catalogue raisonne and recorded in his studio's archives. (Id. ¶ 98.)
Where necessary, Meyer and Dorfman took other steps to conceal their scheme and ensure its survival. For instance, in January 2010, one victim sent an image to Jasper Johns' studio of a piece that it purchased from Dorfman. (Id. ¶¶ 85-86.) Meyer promptly contacted Dorfman and sought his assistance in having the artwork returned to the studio. To cover their tracks, Meyer asked Dorfman to "wipe" it with "glass cleaner" to eliminate fingerprints and send it "with no return information" so its origin could not be traced. Dorfman acquiesced, responding to Meyer as follows: "Tell me exactly what you want and how you want it and [y]ou will get it." (Id. ¶ 86.)
In total, of the eighty-three individual pieces Meyer stole from Johns' studio, forty-two were provided to Dorfman, of which thirty-seven were sold for a profit exceeding $9 million. (Id. ¶ 50.) As the mastermind behind the scheme, Dorfman and his business entities pocketed almost two-thirds of the profits, or approximately $5.99 million. Eventually, however, the fraud was discovered and in August 2013, Meyer was indicted by a federal grand jury sitting in this District and charged with one count of transporting stolen property across state lines and one count of wire fraud. (Id. ¶ 89; see also Compl., Ex. B.) In June 2014, he pled guilty to the interstate transportation of stolen property and was sentenced to an eighteen-month term of imprisonment and two years of supervised release. He was also ordered to pay restitution to the victims, including Jasper Johns. According to Plaintiff, the artwork it purchased from Dorfman in January 2008, i.e. the one at issue in this case, was identified in the order of restitution as one of the stolen Johns artworks. (Compl. ¶ 90; see also Compl., Ex. D.) Dorfman was never indicted or otherwise charged with any criminal wrongdoing.
Under an October 17, 2016 assignment agreement, the art advisor who purchased the stolen artwork for Plaintiff assigned to the latter all claims it had against Dorfman and his business entities arising out of the sale of the stolen artwork, including its rights under a statute of limitations tolling agreement it entered into with Defendants in July 2015. Under the July 2015 tolling agreement, Defendants agreed that the time period beginning on August 1, 2012, until August 1, 2016, would not be included in computing the relevant statute of limitations for any claim by the art advisor or any of its transferees. (Id. ¶¶ 93, 100.) This action followed on January 11, 2017. (See id. at 47.)
Plaintiff asserts federal claims against Dorfman and his business entities for violating and conspiring to violate the RICO Act, as well as state law claims for fraud, breach of warranty, and unilateral mistake. (Id. ¶¶ 103-265.) In particular, Plaintiff charges Defendants with engaging in numerous predicate acts of racketeering activity, including transporting stolen goods, mail fraud, wire fraud, and trafficking *569 in counterfeit labels with respect to works of visual art. (Id. ¶¶ 167-229.) Plaintiff seeks compensatory damages, rescission of the sale, treble damages and attorneys' fees under RICO, and punitive damages. (Id. at 47.)
II. LEGAL STANDARDS
A. Federal Rule of Civil Procedure 12(b)(6)
To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. In deciding a 12(b)(6) motion, the court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.[7] See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC, 709 F.3d 109, 119-20 (2d Cir. 2013) ; Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002), The court, however, need not credit "mere conclusory statements," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937, nor must it give effect to "legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ).
B. Rule 9(b)'s Heightened Pleading Standards
In addition to meeting the requirements of Rule 12(b)(6), a plaintiff alleging fraud or mistake, as here, must also satisfy the heightened pleading standards of Rule 9(b), which requires such a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, "a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " Wood ex rel. U.S. v. Applied Research Assocs., Inc., 328 Fed.Appx. 744, 747 (2d Cir. 2009) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) ). In other words, a plaintiff alleging a cause of action sounding in fraud must set forth with sufficient particularity the "who, what, when, where[,] and how of the alleged fraud." U.S. ex rel. Kester v. Novartis Pharm. Corp., 23 F.Supp.3d 242, 252 (S.D.N.Y. 2014) (citation omitted).
III. PLAINTIFF'S RICO CLAIMS
The RICO Act confers a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the RICO statute. 18 U.S.C. § 1964(c) ; see also Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 647, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). The RICO statute, in relevant part, makes it unlawful, "for any person employed by or *570 associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[8] 18 U.S.C. § 1962(c). Thus, to establish a civil RICO claim, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (citations omitted).
Because "the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants,"-and undoubtedly since liability premised on such claims carry with them the threat of treble damages and attorneys' fees-civil RICO has often been referred to as the "litigation equivalent of a thermonuclear device." Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (citations omitted); see, e.g., Palatkevich v. Choupak, 152 F.Supp.3d 201, 216 (S.D.N.Y. 2016) ; Turner v. N.Y. Rosbruch/Harnik, Inc., 84 F.Supp.3d 161, 168 (E.D.N.Y. 2015). Accordingly, courts are encouraged to dismiss RICO allegations at an early stage of the litigation where it is otherwise appropriate to do so. Katzman, 167 F.R.D. at 655 (quoting Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir. 1990) ). In addition, RICO claims premised on mail and wire fraud merit heightened scrutiny in light of "the routine use of mail and wire communications in business operations" and the attendant ease with which a plaintiff may attempt to fashion a RICO claim based on allegations that may turn out to be insufficient to plausibly support one. Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014) (citation omitted).
A. Enterprise
A RICO "enterprise" is defined to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise need not be a formal legal entity, nor must it have a "hierarchical structure or a 'chain of command.' " Boyle v. United States , 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). Rather, it may consist of " 'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven by 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' "[9] First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (quoting United States v. Turkette, 452 U.S, 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ).
Such an "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946, 129 S.Ct. 2237.
*571 Absent these structural requirements, "any two thieves in cahoots would constitute an association-in-fact." Foster v. 2001 Real Estate, No. 14-CV-9434 (RWS), 2015 WL 7587360, at *4 (S.D.N.Y. Nov. 24, 2015) (citation omitted). That is not to say, however, that a complaint must allege that a particularly organized structure existed. Indeed, as the Supreme Court has explained, the existence of an enterprise may be inferred from evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity. Boyle, 556 U.S. at 947, 129 S.Ct. 2237 ; see also Turkette , 452 U.S. at 583, 101 S.Ct. 2524 (noting that while the enterprise must exist "separate and apart from the pattern of activity in which it engages," the "proof used to establish these separate elements may in particular cases coalesce"); United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991) ("[T]he existence of an association-in-fact is oftentimes more readily proven by what it does , rather than by abstract analysis of its structure.") (citation and quotation marks omitted). Nonetheless, to survive a motion to dismiss, the allegations in the complaint must at a minimum establish an enterprise that is "more than the sum of the participants in a series of independent [predicate acts]." Cedar Swamp Holdings , Inc. v. Zaman, 487 F.Supp.2d 444, 452 (S.D.N.Y. 2007).
B. Pattern of Racketeering Activity
To allege a "pattern of racketeering activity," RICO requires proof of two or more predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). "Racketeering activity," in turn, is defined to "encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., --- U.S. ----, 136 S.Ct. 2090, 2096, 195 L.Ed.2d 476 (2016). "These predicates include any act 'indictable' under specified federal statutes," such as those relating to mail and wire fraud, among others. Id. ; see also 18 U.S.C. § 1961(1).
To meet the "pattern of racketeering activity" element, a plaintiff must allege that the predicate acts have "continuity plus relationship which combines to produce a pattern." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citation omitted). This so-called continuity requirement "can be satisfied either by showing a 'closed-ended' pattern-a series of related predicate acts extending over a substantial period of time-or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (citations omitted). Here, Plaintiff does not advance an argument that Defendants engaged in an open-ended pattern of racketeering activity. (Pl.'s Mem. in Opp'n. of Mot. to Dismiss ("Pl.'s Mem."), ECF No. 30, at 21 n.8.) Accordingly, the analysis below will focus only on whether the complaint adequately alleges a closed-end pattern of racketeering activity.
As noted, to demonstrate closed-end continuity, a plaintiff must allege "a series of related predicates extending over a substantial period of time." Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 242 (citation omitted) (emphasis added). Closed-end continuity is primarily a temporal concept, and while not a bright-line rule, the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time." Spool, 520 F.3d at 184 (citation omitted). The mere fact, however, that predicate acts span two-years is *572 insufficient, without more, to establish a pattern of racketeering activity. First Capital, 385 F.3d at 181. Other factors, "such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." DeFalco, 244 F.3d at 321.
C. Predicate Acts
Plaintiff alleges that Defendants engaged in at least four predicate acts: mail fraud, wire fraud, transporting stolen goods, and trafficking in counterfeit labels with respect to works of visual art. (Compl. ¶ 167.)
"To state a mail and wire fraud claim under RICO, a plaintiff must allege that the defendant made two predicate communications, via interstate commerce, that constitute a pattern of racketeering activity." Mills v. Polar Molecular Corp. , 12 F.3d 1170, 1176 (2d Cir. 1993) (citation omitted); see also 18 U.S.C. §§ 1341, 1343 ; McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992) ("To prove a violation of the mail fraud statute, plaintiffs must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme."). Those allegations "should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." Mills, 12 F.3d at 1176.
The RICO statute defines racketeering activity to include, inter alia, acts indictable under Sections 2314, 2315, and 2318 of Title 18 of the United States Code. See 18 U.S.C. § 1961(1). Section 2314 prohibits, among other things, the interstate or foreign transport of stolen goods valued at $5,000 or more. Id. § 2314. Section 2315 prohibits the knowing receipt, sale, concealment, possession, or disposition of stolen goods that have been transported interstate or abroad after being stolen, unlawfully converted, or taken. Id. § 2315. Section 2318 prohibits trafficking in counterfeit labels affixed to works of visual art. Id. § 2318.
D. Plaintiff's Allegations State a Claim Under RICO
Defendants incorrectly argue that Plaintiff's RICO claims must be dismissed because the complaint's allegations fail to establish that Defendants engaged in predicate acts with sufficient continuity to constitute a "pattern of racketeering activity," and that the purported "association-in-fact" enterprise between Meyer, Dorfman, and Dorfman's business entities existed independently of the activity in which its members engaged. (Defs.' Mem. at 7-14.)
First, the complaint adequately alleges that Dorfman, by and through his business entities, and Meyer engaged in a closed-end pattern of racketeering activity. Specifically, Plaintiff alleges that from 2006 through at least February 2012, Dorfman and Meyer knowingly sold and caused to be transported thirty-seven stolen Jasper Johns artworks to more than twenty purchasers in the United States and around the globe. (Compl. ¶¶ 163-65, 169-211.) Plaintiff alleges further that the predicate acts of mail fraud, wire fraud, and interstate transportation of stolen goods had a similar purpose, similar methods of commission, similar victims, and similar results-namely, the sale of stolen artwork for profit to unsuspecting buyers. See H.J., Inc., 492 U.S. at 240, 109 S.Ct. 2893. Plaintiff's allegations identify in sufficient detail the roles that Dorfman and Meyer each played in the scheme, including Meyer's role in stealing the artworks and signing the knowingly false affidavits attesting to his status as their rightful owner, and Dorfman's role in finding buyers, negotiating the sales, and shipping the *573 stolen artwork to their respective purchasers, as well as the precise nature of their fraudulent statements and conduct. (See Compl. ¶¶ 50-66, 79, 163-65, 169-211.)
That the scheme involved "little variety" in the fraudulent acts, may have been committed by only two individual actors, and involved the stolen artwork of just one artist, (Defs.' Mem. at 10-11), is of little consequence, "Courts have routinely found that continuity exists where the alleged scheme spans such a substantial period of time, even where only a single victim or single scheme was involved." Marini v. Adamo, 812 F.Supp.2d 243, 253, 262-63 (E.D.N.Y. 2011) (finding closed-end continuity where the plaintiff alleged that the defendants engaged in a single scheme to defraud at least five victims over six years for a total alleged loss of approximately $14.5 million, and collecting cases). Moreover, Defendants' characterization of the Meyer/Dorfman plot as "a discrete scheme with a narrow purpose," (Defs.' Mem. at 11), ignores the magnitude of Plaintiff's allegation that Meyer and Dorfman worked in tandem to defraud more than twenty victims over six years to the tune of more than $9 million. Plaintiff has therefore adequately alleged that Dorfman and Meyer engaged in a pattern of racketeering activity.
Second, Plaintiff has sufficiently alleged that an association-in-fact enterprise existed consisting of Meyer, Dorfman, and Dorfman's business entities. Plaintiff alleges that Meyer and Dorfman shared a common purpose and goal of selling stolen art for profit. It has also alleged and articulated with sufficient detail the nature of the relationships between Meyer, Dorfman, Dorfman's entities, and the enterprise. In particular, Plaintiff alleges that Meyer was responsible for providing the stolen artwork and signing affidavits as to their "authenticity," while Dorfman, by and through his business entities-the name, reputation and resources of which were critical to enabling the enterprise to succeed-would present those works to interested buyers. See De Sole v. Knoedler Gallery, LLC, 137 F.Supp.3d 387, 404 (S.D.N.Y. 2015) (noting that an art gallery's "blue-chip reputation was a key element of the enormous success" of a fraudulent enterprise to sell forged art). Finally, Plaintiff has alleged that the enterprise had sufficient longevity-over six years-to permit its associates, Meyer and Dorfman, to pursue the enterprise's purpose of selling stolen Jasper Johns artwork to unsuspecting buyers. Indeed, in January 2010, when it appeared that they were at risk of being caught, Meyer and Dorfman joined forces to conceal their scheme and ensure the enterprise's survival. Plaintiff has thus adequately alleged the existence of an association-in-fact enterprise consisting of Meyer, Dorfman, and Dorfman's business entities, See Boyle , 556 U.S. at 946, 129 S.Ct. 2237.
Accordingly, Plaintiff's complaint plausibly states a RICO claim sufficient to defeat Defendants' motion to dismiss.[10]
IV. PLAINTIFF'S STATE LAW CLAIMS
Apart from its RICO claims, Plaintiff also asserts state law claims against all Defendants for fraud, breach of warranty, *574 and unilateral mistake.[11] (Compl. ¶¶ 103-49, 244-65.)
A. Plaintiff's Breach of Warranty Claim
1. Plaintiff's Breach of Warranty Claim is Untimely Under U.C.C. § 2-725
Plaintiff's sixth cause of action is for breach of warranty under Sections 2-312 and 2-313 of the Uniform Commercial Code ("UCC"). (Compl. ¶¶ 244-45.) Article 2 of the UCC governs the sale of goods, including the sale of fine art. See N.Y. U.C.C. §§ 2-102, 2-105 ; De Sole v. Knoedler Gallery, LLC, 974 F.Supp.2d 274, 316-17 (S.D.N.Y. 2013). Section 2-312 provides that "there is in a contract for sale a warranty by the seller that the title conveyed shall be good, and its transfer rightful." Id. § 2-312(1). Under Section 2-313, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Id. § 2-313(1)(a). "[T]o demonstrate that an express warranty was created under New York law, a plaintiff must prove that the statement falls within the definition of warranty, that she relied on it, and that it became part of the basis for the bargain." Kraft v. Staten Island Boat Sales, Inc., 715 F.Supp.2d 464, 473 (S.D.N.Y. 2010) (citation and quotation marks omitted).
Plaintiff's breach of warranty claim is time-barred under Section 2-725 of the UCC. (See Defs.' Mem. at 15-16.) Section 2-725 provides that "[a]n action for breach of any contract for sale [governed by Article 2 of the UCC] must be commenced within four years after the cause of action has accrued." N.Y. U.C.C. § 2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach[,]" and a "breach of warranty occurs when tender of delivery is made." Id. § 2-725(2).
Plaintiff's claim is plainly barred by Article 2's statute of limitations. Plaintiff purchased the artwork at issue on or about January 15, 2008, and commenced this action almost nine years later, on January 11, 2017. The tolling agreement entered into by Defendants and the art advisor cannot save Plaintiff's breach of warranty claim; it only tolled the time period from August 1, 2012, through August 1, 2016. Because more than four years elapsed between January 15, 2008, and August 1, 2012, Plaintiff's breach of warranty claim is untimely.
2. Equitable Tolling Does Not Apply
Nevertheless, Plaintiff urges that the statute of limitations be tolled as a result of Defendants' fraudulent concealment of the artwork's true origin. (Pl.'s Mem. at 23-25.) "Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."[12]
*575 Abbas v. Dixon , 480 F.3d 636, 642 (2d Cir. 2007) (citation and quotation marks omitted). In other words, a plaintiff "must show that the defendant wrongfully concealed its actions, such that plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner, or that defendant's actions induced plaintiff to refrain from commencing a timely action." De Sole, 974 F.Supp.2d at 318. In addition, a plaintiff must establish that it was the defendants' subsequent actions-"separate from the ones for which they sue"-that kept it from bringing suit, Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1184 (2012) (citations omitted), and that its reliance on the subsequent misrepresentations was "reasonable." Zumpano v. Quinn , 6 N.Y.3d 666, 816 N.Y.S.2d 703, 849 N.E.2d 926, 929 (2006).
Here, Plaintiff argues that equitable tolling should be applied because Defendants perpetrated a fraud that was self-concealing, and because they took additional steps to conceal from Plaintiff the existence of the cause of action. (Pl.'s Mem. at 23.) In particular, Plaintiff claims it was lulled into inaction by: (1) the purchase agreement's confidentiality clause; (2) the January 20, 2010 email from Meyer indicating that the artworks were "given" to him; (3) the February 2, 2010 email from Dorfman's wife indicating that the artwork was a gift from Jasper; and (4) the September 2011 certification that the sold artwork would be included in the Jasper Johns' catalogue raisonne. (Id. at 23-24.)
Although it is unclear whether the confidentiality agreement described in the complaint even prohibited Plaintiff from independently verifying the provenance of the purchased artwork, it is undisputed that it was tendered to Plaintiff in connection with the sale of the artwork itself. Equitable tolling is appropriate, however, only where the alleged misconduct comes after -and is entirely distinct from -the events giving rise to the underlying claim. See Corsello, 944 N.Y.S.2d 732, 967 N.E.2d at 1184. Accordingly, the confidentiality clause cannot provide an adequate basis for equitable tolling.[13]
For the same reasons, Plaintiff cannot benefit from the January 20, 2010 and February 2, 2010 emails; those statements were "made in an effort to sell more forged paintings, rather than to conceal Defendants' prior fraud." Martin Hilti Family Tr. v. Knoedler Gallery, LLC, 137 F.Supp.3d 430, 469 (S.D.N.Y. 2015). In support of their motion to dismiss, Defendants have submitted copies of the complete emails referenced in the complaint, all of which explicitly reference paintings different from the one Plaintiff purchased in January 2008. (See Letter to the Court from Gerald J. Di Chiara dated June 14, 2017, ECF No. 37, Exs. 4-5 (discussing a Jasper Johns painting identified as an *576 "Untitled 1982 triptych on canvas").) Even on a motion to dismiss, where a document cited in the complaint is inconsistent with the allegations set forth in the complaint, "the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." TufAmerica, Inc. v. Diamond, 968 F.Supp.2d 588, 592 (S.D.N.Y. 2013) (citation and quotation marks omitted). Accordingly, these emails provide no basis for equitable tolling. See Hilti, 137 F.Supp.3d at 468-69 (denying equitable tolling where defendant sought to sell additional fake Rothko paintings by referencing a prior fraudulent sale of a Rothko from "the same source").
Finally, the September 2011 certification, allegedly prepared almost four years after the sale, is by itself insufficient to justify equitable tolling. Moreover, there is no allegation in the complaint that the certification was ever provided to Plaintiff, much less that Plaintiff relied on it in sleeping on its rights. See Twersky v. Yeshiva Univ., 993 F.Supp.2d 429, 442-43 (S.D.N.Y. 2014) ("In order to invoke equitable estoppel, a plaintiff must ... demonstrate reasonable reliance on the defendant's misrepresentations[.]"); see also Hilti, 137 F.Supp.3d at 469 (declining to apply equitable tolling where the plaintiff failed to allege that it even knew of the subsequent fraudulent statement).
Plaintiff's breach of warranty claim is therefore DISMISSED as untimely.
B. Plaintiff's Remaining State Law Claims
Defendants argue that Plaintiff's fraud and mistake claims should be dismissed as duplicative of their claim for breach of warranty. (See Defs.' Mem. at 22-24.) In the alternative, Defendants argue that this Court should dismiss Plaintiff's fraud-based and mistake claims as time-barred since they arise from the same facts as its breach of warranty claim and are thus governed by the UCC's four-year statute of limitations.[14] (Id. at 16.) Defendants also argue that Plaintiff's fraud-based claims should be dismissed for failing to comply with Rule 9(b)'s heightened pleading requirements. (Id. at 24-25.)
1. Plaintiff's Fraud and Unilateral Mistake Claims are Properly Before This Court
As an initial matter, insofar as Plaintiff's breach of warranty claim has already been dismissed, Defendants' argument that the fraud-based and mistake claims are duplicative of its breach of warranty claim fails.
Defendants' alternative argument that Section 2-725 of the UCC governs Plaintiff's fraud and mistake claims fails, too; indeed, that argument was considered and rejected by the Second Circuit in Rosen v. Spanierman , 894 F.2d 28 (2d Cir. 1990). In Rosen, the plaintiffs were buyers of a painting that turned out to be a fake. They asserted claims for fraud and breach of warranty, both of which the district court dismissed under the UCC's four-year statute of limitations. Id. at 29. On appeal, the Second Circuit agreed that the breach of warranty claim was untimely but reversed as to the fraud claim. Id. at 30. The court began its analysis by observing that under New York law, a plaintiff may not assert "fraud claims that are merely incidental to claims for breach of contract." Id. at 35. The court went on, however, to find *577 that since the plaintiffs' fraud claim was, as here, a claim that they had been fraudulently induced into purchasing the painting, it was "separate and distinct from a claim for breach of contract under New York law," and thus subject to the longer statute of limitations for fraud claims. Id. at 35-36 & n.2 (citations omitted). Other courts have ruled similarly with respect to fraud and mistake claims in circumstances akin to those alleged here. See, e.g., Rouse v. Elliot Stevens, Ltd., No. 13-CV-1443 (SN), 2016 WL 8674688, at *4-5 (S.D.N.Y. June 24, 2016) (dismissing breach of contract claim as untimely but allowing fraud claim to proceed since the plaintiff's fraudulent inducement claim was "separate and distinct from [its] breach of contract claim"); Hilti, 137 F.Supp.3d at 459, 465-66 (analyzing timeliness of breach of warranty claim under Section 2-725 of the UCC and of fraud and mistake claims separately under Section 213 of New York's Civil Practice Law and Rules ); De Sole, 974 F.Supp.2d at 317-20 (allowing mistake claims to proceed but dismissing breach of warranty claim as untimely under Section 2-725 of the UCC ).
Accordingly, this Court finds that Plaintiff's fraud and mistake claims are sufficiently distinct from the facts and circumstances giving rise to its breach of warranty claim and are thus not governed by the UCC's four-year statute of limitations.[15] In New York, a cause of action based upon mistake must be brought within six years, while an action based on fraud must be commenced within "six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(6), (8). It is undisputed that Plaintiff purchased the artwork at issue on or about January 15, 2008, and that the tolling agreement entered into by Defendants and the art advisor tolled the statute of limitations from August 1, 2012, through August 1, 2016. Because this action was filed on January 11, 2017, Plaintiff's fraud and mistake claims are timely.
2. Plaintiff Has Satisfied Rule 9(b)
Under New York law, "a claim for fraud consists of five elements: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." Kottler v. Deutsche Bank AG, 607 F.Supp.2d 447, 462 (S.D.N.Y. 2009) (citation and quotation marks omitted). As noted, Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff asserting a fraud claim to "state with particularity the circumstances constituting fraud," including an explanation of why the statements were fraudulent. Fed R. Civ. P. 9(b) ; Kottler, 607 F.Supp.2d at 462. Here, the only apparent element in dispute is whether Plaintiff's reliance was reasonable.
"In assessing the reasonableness of a plaintiff's alleged reliance,"
*578 courts "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) (citation omitted). Where "matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely [on his representations] without prosecuting an investigation, as he had no independent means of ascertaining the truth." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006) (citation and quotation marks omitted). By contrast, "[a] plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth" of the defendant's statements. Id.
Whether Plaintiff's reliance on Defendants' representations was reasonable cannot be resolved as a matter of law on Defendants' motion to dismiss. Indeed, as the Second Circuit has counseled, "[t]he question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) ; see also Hilti, 137 F.Supp.3d at 483 (denying motions to dismiss plaintiff's fraud claims and finding question of fact on issue of reliance); De Sole, 974 F.Supp.2d at 313 (same). Here, Defendants are a highly esteemed art gallery and, at the time of the sale, Meyer, the purported seller, held himself out both as having good title and as Jasper Johns' aide for twenty-four years; under these circumstances, it is by no means clear how or why Plaintiff should have suspected that the sale was not legitimate.
Further, Meyer's claim of good title to the artwork is certainly a matter uniquely within his knowledge and one which presented few viable options for ascertaining its truth. To be sure, Plaintiff does not allege that it ever tried to contact Meyer to verify his claims, but doing so would likely have been seen as unnecessary in light of the affidavit he provided. Moreover, requiring Plaintiff to have reached out to Jasper Johns himself to ascertain the artwork's authenticity and verify Meyer's title to it seems both unduly burdensome and impractical, not to mention in contravention of accepted industry norms. See Joseph P. Carroll Ltd. v. Baker , 889 F.Supp.2d 593, 602 (S.D.N.Y. 2012).
Defendants argue that Plaintiff has failed to meet its burden of demonstrating that its reliance was reasonable because "it has not pled any facts about its diligence procedures." (Defs.' Mem. at 24.) Plaintiff, however, alleges that it reasonably relied on Meyer's affidavit, which Defendants prepared and provided to the art advisor, because it lacked adequate means of verifying Meyer's assertions since the fact that the artwork was stolen was known only to Meyer-the purported owner-and Dorfman. (Compl. ¶¶ 75, 103, 106, 111.) In addition, Plaintiff alleges that because the artwork was in fact created by Jasper Johns, and because it is common for artists to baiter or gift works to their aides, it was reasonable to believe the work was authentic and that Meyer held good title. (Id. ¶¶ 62, 74.) Whether Plaintiff engaged in particular "diligence procedures," as Defendants characterize them, is beside the point; all Plaintiff must show is that its reliance was reasonable, which it may do without explaining the precise nature and extent, if any, of its due diligence. Ultimately, whether Plaintiff's reliance was reasonable remains a question for the trier of fact to decide after weighing all the relevant facts and circumstances surrounding the transaction.
*579 V. PLAINTIFF'S DEMAND FOR PUNITIVE DAMAGES
Finally, Defendants ask this Court to strike Plaintiff's demand for punitive damages since "[t]he simple misrepresentation of a piece of artwork's provenance, whether intentional or unintentional, is not an extraordinary act that should subject a defendant to punitive damages." (Defs. Mem. at 25.)
A party's entitlement to punitive damages is not automatic. Rather, where, as here, an action "has its genesis in the contractual relationship between the parties," a plaintiff seeking punitive damages must show that "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be [sufficiently] egregious ...; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." N.Y. Univ. v. Cont'l Ins. Co. , 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 767 (1995). To merit an award of punitive damages, a plaintiff must show that the tortious conduct "is gross and involves high moral culpability." Walker v. Sheldon, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497, 499 (1961) ; see also Rocanova v. Equitable Life Assurance Soc'y of U.S., 83 N.Y.2d 603, 612 N.Y.S.2d 339, 634 N.E.2d 940, 943 (1994) (holding that punitive damages are available where a fraud "evince[es] a high degree of moral turpitude and demonstrate[es] such wanton dishonesty as to imply a criminal indifference to civil obligations") (citation omitted).
Plaintiff's allegations provide a sufficient basis for a jury to award punitive damages. Defendants' alleged tortious conduct is actionable as an independent tort and involved high moral culpability. Over the course of six years, Defendants engaged in an elaborate scheme to swindle over twenty victims, including Plaintiff, out of more than $9 million. Indeed, Dorfman's associate in the enterprise was indicted for his conduct and sentenced to a term of incarceration. Finally, Plaintiff has alleged that the pattern of tortious activity targeted members of the public both at home and abroad. Punitive damages may therefore be an appropriate remedy in this case. See Ball v. Cook, No. 11-CV-5926 (RJS), 2012 WL 4841735, at *11-13 (S.D.N.Y. Oct. 9, 2012) (awarding $1 million in punitive damages to an art collector whose works had been sold without his knowledge or consent); Artcurial, S.A. v. Lowenthal, 763 F.Supp. 768, 769-70 (S.D.N.Y. 1991) (awarding $100,000 in punitive damages to a plaintiff who purchased fake artwork held out to be authentic).
VI. CONCLUSION
Defendants' Motion to Dismiss is GRANTED as to Plaintiff's claim for breach of warranty and DENIED in all other respects. Plaintiff's sixth cause of action for breach of warranty is therefore DISMISSED with prejudice.
The Clerk of Court is directed to close the motion at ECF No. 21 accordingly.
SO ORDERED.

Although Fred Dorfman has always operated Fred Dorfman, Inc. as "Dorfman Projects," he never formed the defendant-company known as "Dorfman Projects LLC" until well after the events at issue in this case concluded. (See Compl. ¶¶ 21, 23-24.) For the sake of clarity, and because it is alleged that at all relevant times Fred Dorfman exercised complete dominion and control over both entities, the names "Fred Dorfman, Inc.," "Dorfman Projects," and "Dorfman Projects LLC" are used interchangeably throughout this memorandum decision and order. (See id. ¶¶ 23-29.)

The principal place of Dorfman's business is in nearby New York City. (Compl. ¶ 21.)

The complaint alleges that Dorfman's wife, Susan Spagna, notarized each affidavit. (See Compl. ¶ 53.) During oral argument, however, plaintiff's counsel asserted that Ms. Spagna, an attorney by trade, drafted the affidavits, as well. (Oral Arg. Tr., ECF No. 43, at 51:15-52:1.)

"A catalogue raisonne is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonne serves to authenticate the work, while non-inclusion suggests that the work is not genuine." Kirby v. Wildenstein , 784 F.Supp. 1112, 1113 (S.D.N.Y. 1992).

The art adviser is identified in the complaint only as a "Midwest corporation owned by a non-New York resident." (Compl. ¶ 19.)

To ensure that the identities of the buyer and seller be kept confidential, as is common practice in private art sales, the transaction was memorialized by two invoices: one from Dorfman to the art advisor and one from the art advisor to Plaintiff. The invoice sent to Plaintiff from the art advisor included a fictitious inventory number for the artwork that was provided by Dorfman. (Compl. ¶¶ 68-70.)

"In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " Fishbein v. Miranda, 670 F.Supp.2d 264, 271 (S.D.N.Y. 2009) (quoting Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993) ).

The RICO statute also makes it unlawful to conspire to engage in such activity. See 18 U.S.C. § 1962(d).

In addition, the enterprise must be engaged in, or its activities must affect, interstate or foreign commerce. See 18 U.S.C. § 1962(c). Under well-settled Second Circuit case law, this requirement is met so long as the plaintiff can show a "minimal effect on interstate commerce." DeFalco v. Bernas, 244 F.3d 286, 309 (2d Cir. 2001). Here, Plaintiff has alleged that Meyer transported the stolen Jasper Johns artwork from Johns' studio in Connecticut to Dorfman's place of business in New York and that they sold it to Plaintiff, who is located in Vancouver. (Compl. ¶¶ 169-71.) Accordingly, Plaintiff has sufficiently alleged an impact on interstate commerce.

Defendants seek dismissal of Plaintiff's fifth cause of action for RICO conspiracy by arguing that such a claim must be dismissed where a complaint fails to establish a "substantive claim for civil RICO." (Defs.' Mem. at 15.) Since, for the reasons stated above, Plaintiff's complaint states a claim under RICO, Plaintiff's RICO conspiracy claim survives Defendants' motion to dismiss.

Plaintiff's state law claims properly invoke this Court's diversity jurisdiction; the amount in controversy exceeds $75,000 and Plaintiff is a resident of a foreign state while Defendants are all residents of New York. See 28 U.S.C. § 1332(a). When a federal district court sits in diversity, it generally applies the substantive law of the state in which it sits. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Accordingly, and because the parties suggest no alternative, Plaintiff's state law claims are analyzed under New York law.

Since Plaintiff's breach of warranty claim arises under New York law, this Court applies New York's equitable tolling doctrine. See Statistical Phone Philly v. NYNEX Corp., 116 F.Supp.2d 468, 482 (S.D.N.Y. 2000) (citation omitted).

Plaintiff's reliance on De Sole v. Knoedler Gallery, LLC, 137 F.Supp.3d 387 (S.D.N.Y. 2015), is inapposite. (Pl.'s Mem. at 23.) The court in De Sole seemed to suggest that equitable tolling may be appropriate where the fraudulent act is self-concealing, relying on New York v. Hendrickson Bros., 840 F.2d 1065 (2d Cir. 1988). 137 F.Supp.3d at 423. As another court has pointed out, however, that proposition seems to be in tension with well-settled New York case law holding that, to invoke equitable tolling of the statute of limitations, "a plaintiff may not rely on the same act that forms the basis for the claim-the later fraudulent misrepresentation must be for the purpose of concealing the former tort." Fertitta v. Knoedler Gallery, LLC, No. 14-CV-2259 (JPO), 2015 WL 374968, at *9 (S.D.N.Y. Jan. 29, 2015) (citing Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 836 N.Y.S.2d 509, 868 N.E.2d 189, 198 (2007) ).

Although Plaintiff asserts three distinct causes of action for "fraud," "aiding and abetting fraud," and "fraudulent concealment," (see Compl. ¶¶ 103-49), Defendants, in seeking their dismissal, treat them as one, referring to them simply as Plaintiff's "fraud-based claims." (See Defs.' Mem. at 16-24.) Accordingly, this Court's analysis does not differentiate between Plaintiff's fraud claims.

Plaintiff's reliance on Wuhu Import & Export Corp. v. Capstone Capital LLC, 39 A.D.3d 314, 834 N.Y.S.2d 129 (1st Dep't 2007), is misplaced. In Wuhu, the causes of action for fraud and breach of contract were "all premised on the same allegation, namely, nonpayment for goods." 39 A.D.3d at 315, 834 N.Y.S.2d 129. Here, by contrast, the fraud and mistake claims are based on independent representations that were made before the parties even entered into a contract and are thus distinct from Plaintiff's claim that Defendants intentionally breached its warranty. See Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 743-44 (2d Cir. 1979) ("New York law recognizes the right to plead contract and tort causes of action arising out of a single transaction, although different statutes of limitation may apply to the separate claims.").